HERRICK, FEINSTEIN LLP
David Feuerstein (admitted *pro hac vice*)
E-mail: dfeuerstein@herrick.com
Jessica Natbony (admitted *pro hac vice*)
E-mail: jnatbony@herrick.com
2 Park Avenue
New York, New York 10016
Telephone:  (212) 592-1400

KAWAHITO SHRAGA & WESTRICK LLP
David R. Shraga (SBN 229098)
E-mail: dshraga@kswlawyers.com
1990 S. Bundy Dr., Ste. 280
Los Angeles, California 90025
Phone: (310) 746-5300
Facsimile: (310) 593-2520

Attorneys for Plaintiff ENKI Corporation

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| ENKI CORPORATION (f/k/a ENKI, LLC)<br><br>             Plaintiff,<br><br>vs.<br><br>KEITH FREEDMAN, an individual, FREEFORM TECHNOLOGIES, LLC, a California limited liability company; ZUORA, INC., a corporation of unknown origin; and DOES 1 through 100,<br><br>             Defendants. | Case No.:  CV13-02201<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030 et seq.);**<br><br>**(2) Violation of Computer Data Access and Fraud Act (Cal. Penal Code § 502);**<br><br>**(3) Breach of Contract;**<br><br>**(4) Breach of Contract;** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(5) **Breach of Contract;**

(6) **Misappropriation of Trade Secrets (Cal. Civ. Code § 3426 et seq.)**

(7) **Intentional Interference with Contractual Relations; and**

(8) **Violation of Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.)**

## DEMAND FOR JURY TRIAL

FIRST AMENDED COMPLAINT

1    Plaintiff ENKI Corporation (formerly known as ENKI, LLC ("ENKI" or
2    the "Company")), by and through its undersigned attorneys, as and for its
3    Complaint against Keith S. Freedman ("Freedman"), Freeform Technologies,
4    LLC ("Freeform"), Zuora, Inc. ("Zuora"), and DOES 1 through 100, alleges as
5    follows:

**PRELIMINARY STATEMENT**

6

7        1.    This action for money damages and equitable relief arises out
8    of (i) Freedman's repeated attempts to destroy ENKI's valued relationship with its
9    former client, Zuora, and (ii) Defendants' concerted theft of ENKI's trade secret
10   information.

11       2.    As set forth more fully below, Freedman -- who, until May
12   2011, was a member of ENKI -- engaged in a course of bad faith conduct (ranging
13   from simple breach of contract to the violation of a federal computer fraud statute)
14   in an effort to depict ENKI as an incompetent and unnecessary consultant and to
15   convince Zuora to leave ENKI and retain Freeform, a company wholly owned by
16   Freedman, for its cloud computing expertise and other enterprise grade IT
17   services.

18       3.    Ultimately, Freedman convinced Zuora to terminate its
19   relationship with ENKI.  (And when Zuora finally did so, it breached its
20   agreement with ENKI.)  However, to make the transition from ENKI to Freeform
21   as seamless as possible -- such that Zuora could continue its business
22   uninterrupted and, upon information and belief, avoid paying ENKI the service
23   fees that it would otherwise incur to transfer to another service provider --
24   Freedman improperly accessed and copied ENKI's Proprietary Information (as
25   that term is defined in the relevant agreement).

26       4.    With ENKI's Proprietary Information in hand, Freedman and
27   Freeform have effectively "tak[en] over the duties" that ENKI had been
28   performing for Zuora.  Of course, Zuora was well aware -- if not, entirely

- 1 -

complicit -- with Freedman's improper misappropriation of ENKI's trade-secret information. Moreover, and upon information and belief, Freedman, Freeform, and Zuora continue to use ENKI's Proprietary Information to monitor Zuora's data center without having to pay ENKI for the benefit of its expertise and trade secret technologies. Indeed, Zuora has hired Freedman as an employee of Zuora in further violation of its agreement with ENKI.

5. By accessing certain servers and copying ENKI's Proprietary Information and trade secrets, Defendants have violated (i) 18 U.S.C. § 1030 et seq., (ii) California Penal Code § 502(c), (iii) Cal. Civ. Code § 3426.1(d) et seq., and (iv) the contractual obligations they owed to ENKI.

6. Accordingly, ENKI seeks an order (i) enjoining Defendants' illicit conduct, (ii) awarding ENKI money damages in an amount to be determined at trial, but in no event less than $1 million, and (iii) for whatever additional relief the Court determines is just and proper.

## JURISDICTIONAL STATEMENT

7. This Court has original subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338 because the First Claim for Relief arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq.

8. The other claims for relief arise under California statutory and common law. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1338(b) because the claims are joined with substantial and related claims pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq. This Court also has subject matter jurisdiction over these claims on the basis of supplemental jurisdiction under 28 U.S.C. § 1367(a), because (i) the federal and state law claims asserted herein are based upon the same operative facts, (ii) the Court's exercise of jurisdiction over the pendent state law claims will promote judicial economy, convenience, and fairness to the parties, and (iii) such

claims are so related to the First Claim for Relief that they form part of the same case or controversy under Article III of the United States Constitution.

## **INTRADISTRICT ASSIGNMENT**

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred or had effects in this District, and because all named Defendants hereto reside in this District for purposes of 28 U.S.C. § 1391(b), conduct business in this District by, among other things, engaging in the violations of federal statutory law set forth herein, and are subject to personal jurisdiction in this District.

10. Pursuant to the Local Rules 3-2 and 3-5 of the United States District Court for the Northern District of California, assignment to the San Francisco Division of this District Court is appropriate because a substantial part of the events or omissions which give rise to the claims set forth herein occurred in San Mateo County, which is located within this Division.

## **THE PARTIES**

11. Plaintiff is a Colorado corporation with its principal place of business located at 2135 S. Cherry Street, Suite 240, Denver, Colorado 80222, and conducts business in this judicial District. Plaintiff was formerly known as ENKI, LLC.

12. Upon information and belief, Defendant Freedman is an individual residing in San Francisco, California, and he conducts business in this division of this judicial District.

13. Upon information and belief, Defendant Freeform is a California limited liability company, with its principal place of business located at P.O. Box 14843, San Francisco, California. Upon further information and belief,

1   Freeform conducts business in this division of this judicial District and is the alter
2   ego of Freedman, including because Freedman influences and governs Freeform
3   and maintains a unity of interest and ownership such that the individuality or
4   separateness of Freeform and Freedman has ceased, and adherence to the fiction
5   of the separate existence of Freeform would, under the circumstances presented by
6   this case, sanction a fraud or promote injustice.  Upon further information and
7   belief (i) Freeform and Freedman have commingled funds and other assets, failed
8   to segregate funds of the separate entities, and diverted corporate funds or assets
9   to other than corporate uses, (ii) Freedman has treated the assets of Freeform as
10  his own, (iii) Freedman is the controlling officer, manager, and member of
11  Freeform, (iv) Freedman has failed to adequately capitalize Freeform, (v)
12  Freeform is used as a mere shell, instrumentality, or conduit for the business of
13  Freedman, and (vi) Freedman has disregarded legal formalities vis-à-vis Freeform
14  and failed to maintain arm's length relationships with it.

15          14.    Upon information and belief, Defendant Zuora, is a
16  corporation of unknown origin, with a place of business located in Redwood City,
17  in San Mateo County, California.  Upon further information and belief, Zuora
18  conducts business in this division of this judicial district.

19          15.    Plaintiff does not know the true names and capacities of
20  defendants sued herein as Does 1 through 100, and therefore sue those defendants
21  by such fictitious names.  Plaintiff will seek leave to amend this First Amended
22  Complaint to set forth those defendants' true names and capacities when they
23  become known.  Upon information and belief, each of the fictitiously-named
24  defendants acted as an agent, employee, servant, principal, partner, shareholder,
25  co-conspirator, aider or abettor, or are otherwise responsible for the acts and
26  omissions alleged in this First Amended Complaint.  Freedman, Freeform, Zuora,
27  and DOES 1 through 100 are collectively referred to herein as "Defendants."
28

16.     Upon information and belief, each of the Defendants, including Freedman, Freeform, and Zuora, conspired with each other in order to conduct and conceal their wrongful activities.  Each of the Defendants entered into an actual agreement with each other to participate in the wrongdoing alleged herein, with awareness of the wrongful nature and unlawful object of these activities, and with the intent to knowingly give substantial assistance and encouragement to these wrongful activities.  Upon information and belief, the Defendants also therefore aided and abetted each other in furtherance of their wrongful activities.

17.     Upon information and belief, as the officer, manager, or member who was otherwise in control of Freeform, Freedman committed the wrongful conduct himself, and also orchestrated, authorized, managed, participated in, oversaw, was aware of, allowed, and was responsible for the wrongful activities engaged in by Freeform.

## BACKGROUND

### A.  The Separation Agreement

18.     From August 8, 2006 to May 2011, Freedman was a 12% interest-holding member of ENKI, the business of which was to acquire, manage, develop, improve and operate cloud computing and other enterprise-grade IT services.

19.     In May of 2011, Freedman verbally resigned his position at ENKI.  As Freedman later conceded, he resigned in large part due to his animus toward David Durkee, the CEO of ENKI.

20.     To memorialize Freedman's resignation, the parties executed the Separation Agreement, dated as of June 8, 2011.  Freedman executed the Separation Agreement on or about June 29, 2011.

21.     Pursuant to the terms of the Separation Agreement, the parties agreed that (i) the Company would repurchase Freedman's membership interest in

ENKI and that ENKI would make a lump sum payment to Freedman for that interest, (ii) neither party would disclose the terms of the agreement, (iii) neither party would criticize, denigrate, or disparage the other party, and (iv) Freedman would continue to be bound by the noncompetition covenants contained in the parties' amended and restated operating agreement dated as of March 1, 2011 (the "Operating Agreement").

22. The noncompetition covenants embodied in Section 9.8 of the Operating Agreement ("Section 9.8") provide, in relevant part, as follows:

> (A) <u>Covenant of Non-solicitation</u>. Each of the Service Providing Members agrees that during the time the Service Providing Member serves as a Manager, officer, director, employee and/or consultant of the Company or the Service Providing Member (or an Affiliate of the Service Providing Member) is a Member of the Company and for a period of two years after termination of all such relationships with the Company (such termination date, the "Termination Date"), the Service Providing Member will not, directly or indirectly, (1) solicit the services of any Person who was, within one year prior to the Termination Date, an employee, officer, director or consultant of the Company, (2) interfere with any Person who was, within one year prior to the Termination Date, an employee or officer of the Company for any purpose that may have an adverse effect upon the Company's business activities, or (3) solicit the business of any Person who was, within one

year prior to the Termination Date, a customer or client of the Company.

(B)    Covenant of Non-Competition….[E]ach of the Service Providing Members agrees that during the time the Service Providing Member serves as a Manager, officer, director, employee and/or consultant of the Company or during the time the Service Providing Member (or an Affiliate of the Service Providing Member) is a member of the Company and for a period of two years after the Termination Date, the Service Providing Member will not, in the Restricted Territory, directly or indirectly (through one or more intermediaries), whether individually, or as an officer, director, employee or consultant, compete, in whole or in part with, or assist any Person in competing in whole or in part with, the business engaged in by the Company.

(C)    Covenants Regarding Proprietary Information.
       (1)    "Proprietary Information" shall mean any and all methods, inventions, improvements or discoveries, whether or not patentable or copyrightable, and any other information of a similar nature disclosed to, or discovered or originated by, the Members or otherwise obtained by the Members prior to or after the date of this

Agreement that relate to Cloud Computing, operations services outsourcing, IT service automation, and high performance scalable data center design...or as a consequence or through the Members' engagements by the Company in any technological area previously developed by the Company or developed, engaged in, or researched by the Company, or related to any technology transferred to the Company by one or more of the Members and any other information of a secret, proprietary, confidential or generally undisclosed nature relating to the Company, its products, customers, processes and services, including, but not limited to, trade secrets, processes, products, programs, formulae, apparatus, techniques, know-how, marketing plans, data, improvements, strategies, forecasts, customer lists, and technical requirements of customers and information relating to resting, research, development, software deployment and production computing services, utility-billing, marketing and selling, unless such information is in the public domain to such an extent as to be readily available to competitors.

(2) ...[E]xcept as required in the performance of the Members' duties to the Company, each of the Members agrees that he will not at any time during or after the term of the

Member's engagement as an employee, officer, director, consultant and/or member of the Company, directly or indirectly use, communicate, disclose or disseminate any Proprietary Information.

(D) <u>Specific Enforcement; Legal Fees</u>. Each of the Service Providing Members acknowledges that a breach of this Section 9.8 is likely to result in irreparable and unreasonable harm to the Company, and that injunctive relief, as well as damages, would be appropriate. If a Service Providing Member breaches this Section, the Service Providing Member shall promptly reimburse the Company for all legal fees (and disbursements) incurred by the Company to enforce this Section or to pursue remedies arising as a result of such breach.

**B. Zuora Engages ENKI and Executes the MSA-SOW**

23. Months after Freedman left ENKI, the Company entered into a master services agreement dated as of January 4, 2012 (the "MSA") with Zuora, pursuant to which ENKI agreed to provide Zuora with consulting, cloud computing operations and other enterprise-grade IT services.

24. The services to be provided by ENKI were set forth in Statements of Work.

25. In or around February 2012, ENKI and Zuora entered into a Statement of Work that covered "Managed Operations Services" (the "SOW")

1  which were "intended to operate [Zuora's] datacenters and virtual infrastructure
2  for the purposes of conducting [Zuora's] primary business."

3      26.   The SOW set forth the "Scope of Work" that ENKI was to
4  perform and expressly set forth those services that constituted "Out of Scope
5  Work".

6      27.   The distinction between what was within and what was
7  excluded from the "Scope of Work" was (and is) important because the MSA
8  makes clear that any "trade secrets or know how" that ENKI developed in
9  connection with the "Services" it provided to Zuora -- i.e., the services that were
10  within the "Scope of Work" -- constituted "Work Product" that was "assigned" to
11  Zuora.  On the other hand, "Out of Scope Work" was, by definition, outside the
12  scope of Services that ENKI provided to Zuora and, therefore, would not become
13  "Work Product" that Zuora would be entitled to use without ENKI's express
14  permission.

15      28.   Among other things, the SOW made clear that "Out of Scope
16  Work" included "Application Design & Implementation (Software design and
17  coding)".  (Emphasis added.)  Thus, any "coding" or "scripts" that ENKI authored
18  as part of its services to Zuora was not within the "Scope of Work" (and,
19  therefore, would remain ENKI property).

20      29.   It was no mistake that the "software design and coding" that
21  ENKI performed for Zuora constituted "Out of Scope" work such that it remained
22  ENKI property.  Indeed, the software design and coding was, by its nature,
23  proprietary, confidential, highly commercially sensitive, and was only developed
24  after ENKI expended significant resources and know-how to create (and therefore
25  is in the nature of a trade secret, as discussed further below).

26  **C. Freedman's Campaign to Disparage and Compete With ENKI**

27      30.   In connection with its performance of the agreed upon services
28  to Zuora, ENKI engaged Freeform, an entity wholly owned by Freedman, as a

third party contractor to perform certain limited services to ENKI, and memorialized the terms of Freeform's engagement in a purchase order dated as of February 22, 2012 (the "Purchase Order").

31. The Purchase Order made clear that its initial term was for three months (the "Term") with the availability of week-to-week renewals.

32. Notably, the Purchase Order did <u>not</u> overwrite or trump any provisions of the Separation or Operating Agreements, which remained in effect without any modification. Thus, while Freedman was providing these contracted services to ENKI as a third party contractor at Zuora's facility, he could not disparage ENKI or otherwise compete with ENKI. Nor, for that matter, could Freedman reveal the terms of the Separation Agreement to individuals at Zuora, or use ENKI's Proprietary Information without ENKI's consent.

33. Notwithstanding his contractual obligations, and upon information and belief, when Freedman arrived at Zuora as an ENKI "subcontractor", he immediately sought to be hired by Zuora to perform the same services it had hired ENKI to perform, and attempted to undermine ENKI's engagement with Zuora and induce Zuora to terminate its relationship with ENKI and cut ENKI out of the picture.

34. ENKI had been concerned about Freedman's conduct and the possibility that he may engage in conduct that could destroy ENKI's relationships with its customers (including Zuora). At one point, Eric Novikoff, ENKI's COO, wrote to Freedman and explained that ENKI would "like to be able to confidently deploy you as a subcontractor representing ENKI without worrying about damaging ou[r] relationship with the customer."

35. As it turned out, ENKI's concerns were justified. In fact, Freedman often disparaged ENKI in front of, or to, Zuora personnel by, <u>inter alia</u>, impugning the quality of services being performed by ENKI pursuant to the SOW and engaging in trade libel by telling personnel at Zuora that ENKI was doing

sub-par work. For example, on at least one occasion, Freedman "ghost-authored" an email on behalf of a Zuora employee complaining about ENKI's performance at Zuora. And in another email, which Freedman himself had edited, Freedman endorsed the view that "ENKI hasn't set things up yet . . . and it also sounds like they [meaning ENKI] didn't abide by their original contract commitments." In that same email, the Zuora employee designated Freedman to explain just how ENKI purportedly failed to abide by the original contract commitments.

36. These statements about ENKI were baseless and, upon information and belief, Freedman induced the Zuora employee to make them in furtherance of his plan to interfere with ENKI's relationship with Zuora. Nonetheless, and upon information and belief, Zuora's employees could not author the above-referenced e-mail concerning ENKI's purported failures without Freedman's input. Freedman's conduct in providing such input and making false and damaging statements concerning the quality of ENKI's services constitutes a breach of the non-disparagement provision in the Separation Agreement.

37. Freedman's wrongful conduct was done to further his own economic interest as part of his plan to interfere with ENKI's separate relationship with Zuora. Indeed, by repeatedly disparaging ENKI to Zuora, Freedman made himself (and Freeform) appear to be a better option for providing the services that Zuora was then paying ENKI to provide.

38. Freedman also breached the Separation Agreement by revealing its terms to Zuora personnel.

39. Given Freedman's misconduct, ENKI notified Freeform and Freedman in or around late August of 2012 (and well after the expiration of the Term of Freedman's contract), that it would not be renewing the Purchase Order.

40. Shortly thereafter, Freedman became a consultant for Zuora. As of today, Freedman is an employee of Zuora (even though (i) Freedman was

1  still prohibited from competing with ENKI, and (ii) Zuora was prohibited from

2  soliciting ENKI's "employees" without ENKI's consent).

3  **D. Defendants' Theft of ENKI's Proprietary Information**

4  41.  In the course of doing business, ENKI has created certain

5  Proprietary Information that sets it apart from other cloud computing experts and

6  IT service providers.

7  42.  For example, ENKI pioneered the use of Infiniband for

8  networking in general purpose data-centers. (Previously, Infiniband was primarily

9  used for research or government technologies).

10  43.  The use of Infiniband for networking data-centers is a

11  proprietary method that is confidential and that ENKI takes steps to protect from

12  the public and ENKI's competitors.  It was developed as the result of ENKI's

13  expenditure of significant financial resources and its use of expertise (which itself

14  was developed through the significant expenditure of time and effort). Thus,

15  pursuant to the terms of the Separation Agreement (which incorporates aspects of

16  Operating Agreement in it), ENKI's use of Infiniband constitutes Proprietary

17  Information, including because it gives ENKI a competitive advantage over its

18  competitors who engage in similar cloud computing businesses and the consulting

19  opportunities derived from such businesses.  It also constitutes a trade secret

20  within the meaning of California Uniform Trade Secrets Act for these reasons as

21  well (as explained further below).

22  44.  ENKI recommended to Zuora that it use Infiniband, and based

23  on ENKI's recommendation, Zuora decided to use Infiniband for the data center

24  on which ENKI was working.

25  45.  Freedman had learned how to use Infiniband for networking in

26  general purpose data centers during his tenure with ENKI.  And while the

27  Separation Agreement prohibited Freedman from using Proprietary Information

28  without ENKI's consent, Freedman has used his expertise and knowledge of

ENKI's proprietary methods for using Infiniband to take over ENKI's role at Zuora.

46. Upon information and belief, Freedman never told Zuora that he was bound by any non-competition or non-solicitation provisions (or that either of such provisions even existed) and/or that he could not use ENKI's Proprietary Information -- which included his knowledge of Infiniband -- without ENKI's authorization. Zuora, however, was advised of such prohibitions in discussions it had with ENKI.

47. Freedman also acquired other Proprietary Information while at ENKI, such as expertise in ENKI's proprietary methods for use of the Oracle/Sun 7310 Open Storage system and knowledge of Nimsoft software, all at ENKI's expense.

48. Nimsoft is a software based system monitor that is used to monitor resources and performance in a computer system (such as CPU usage and frequency, or the amount of free RAM, and performance and availability of software applications). Monitoring systems, such as Nimsoft, are also used to display items such as free space on one or more hard drives, the temperature of the CPU and other important components, networking information including the system IP Address and current rates of upload and download, and application performance and uptime data/alarms.

49. Typically, ENKI's clients (such as Zuora) will provide ENKI with the parameters they need or desire for their computing systems and application monitoring. ENKI then uses its trade secret and proprietary know how to program Nimsoft in the most effective manner possible based on its clients requests.

50. Based on the terms of the SOW, ENKI's programming of Nimsoft was <u>not</u> within the SOW's "Scope of Work". As such, ENKI's

programming of Nimsoft remains ENKI's property and constitutes its Proprietary Information.

51. Moreover, the SOW makes clear that ENKI was the exclusive administrator for Nimsoft servers. Thus, ENKI (and only ENKI) was permitted under the parties' agreements to review and alter the Nimsoft codes and scripts used to monitor Zuora's computing systems. Neither Freedman nor Zuora had any legal permission to access Nimsoft as an "administrator" without ENKI's knowledge and consent (which was never provided).

52. Both Freedman and Zuora knew (or should have known) of the proprietary nature of ENKI's work with Nimsoft. In fact, shortly after Zuora requested that Freedman be designated the point person for all issues relating to monitoring, Zuora also made a specific request that Freedman be given "write access to Nimsoft." However, ENKI denied Zuora's request, explaining that "[p]roviding access to anyone outside of ENKI to write changes to the monitoring system would compromise [ENKI's] ability to hold the liability for this SLA Response."

53. When Zuora requested the information again months later, ENKI responded that they were unable to provide the information because "[i]t is proprietary to how we provide our service to our customers and is not exclusive to Zuora."

54. In February 2013, Zuora notified ENKI that it was terminating the SOW "for convenience". At the time of Zuora's "termination", Zuora owed ENKI tens of thousands of dollars from work ENKI already performed under the MSA and SOW. Indeed, Zuora admitted to owing certain fees to ENKI at the time it sent its termination notice.

55. In this way, Zuora breached the MSA which specifically required that Zuora may not terminate for convenience unless it is "current in all

| 1 | undisputed payments then due and payable to ENKI." Zuora still owes ENKI this |
| 2 | money. |

3.     56.    However, before Zuora finally terminated ENKI, Freedman (with, upon information and belief, Zuora's knowledge), unlawfully accessed the Nimsoft servers -- without ENKI's authorization -- and improperly copied ENKI's Proprietary Information to assure Zuora that ENKI was superfluous and could be replaced by Freeform.    Jeff Dutra, a Senior Systems Administrator for Zuora, similarly accessed ENKI's Proprietary Nimsoft servers without authorization at this time.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (By Plaintiff for Violation of Computer Fraud and Abuse Act (18 U.S.C. §§ 1030 et seq.), Against All Defendants)

57.    ENKI repeats and realleges each and every allegation set forth in the foregoing paragraphs as if same were fully set forth herein.

58.    Defendants have violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate or foreign commerce or communication, without ENKI's authorization, and by obtaining information from such a protected computer.

59.    Defendants have also violated the CFAA, 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud ENKI, accessing a protected computer, without authorization, or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value.

60.    Specifically, Freedman -- with, upon information and belief, Zuora's knowledge and consent -- as well as Zuora, accessed the Nimsoft servers, which constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2), and did so without authorization.

61.     Indeed, the parties' agreements make clear that ENKI (and ENKI only) had authority to serve as the "administrator" to Nimsoft and, therefore, only ENKI was entitled to access its Proprietary Information stored on the servers.

62.     By improperly accessing the Nimsoft servers, Freedman and Zuora used this Proprietary Information to set up a new monitoring system for Zuora's data centers. And, because, upon information and belief, Zuora possessed ENKI's Proprietary Information, it was capable of prematurely terminating its relationship with ENKI, which cost ENKI hundreds of thousands of dollars.

63.     Accordingly, ENKI has suffered damages by reason of Defendants' violations, including, without limitation, the appropriation of its Proprietary Information, data, programs, and computer systems, and other losses and damage in an amount to be proven at trial, and well in excess of $5,000 aggregated over a one year period.

64.     At a minimum, ENKI has lost $9,000 because it was forced to investigate Defendants' wrongful conduct and create new software in order to protect its Proprietary Information from future theft. However, the consequential business losses resulting from Defendants' conduct in accessing the servers and copying their content for their own use exceeds hundreds of thousands of dollars.

65.     Defendants' unlawful access to ENKI's computers has caused ENKI irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts. ENKI's remedies at law are not adequate to compensate it for these inflicted and threatened injuries, entitling ENKI to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

## AS AND FOR A SECOND CLAIM FOR RELIEF

**(By Plaintiff for Violation of Computer Data Access and Fraud Act (Cal. Penal Code § 502) Against All Defendants)**

66.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if same were fully set forth herein.

67.    Defendants have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from ENKI's computers, computer systems, and/or computer networks.

68.    Defendants have violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission, accessing and using ENKI's computer services.

69.    Defendants have violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission, accessing, or causing to be accessed, ENKI's computers, computer systems, and/or computer networks.

70.    As set forth above, ENKI owns certain data that comprises information obtained by Defendants as alleged above.

71.    As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused damage to Plaintiff in an amount to be proven at trial.    Plaintiff is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code §502(e).

72.    Upon information and belief, the aforementioned acts of Defendants were willful and malicious in that Defendants' above-described acts were done with the deliberate intent to injure ENKI's business and improve its own. ENKI, therefore, is entitled to punitive damages.

73.    ENKI has also suffered irreparable injury from these acts, and due to the continuing threat of such injury, has no adequate remedy at law, entitling ENKI to injunctive relief.

## AS AND FOR A THIRD CLAIM FOR RELIEF

### (By Plaintiff for Breach of Contract Against Freedman)

74.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if same were fully set forth herein.

75.    At all times relevant hereto, ENKI performed all of its obligations under the Operating and Separation Agreements, which are binding and enforceable agreements between ENKI and Freedman.

76.    Paragraph 11 of the Separation Agreement explicitly incorporates Section 9.3, which precludes Freedman from (i) soliciting any client or customer of ENKI within two years following a termination event, (ii) competing with the Company within two years following a termination event, and (iii) utilizing ENKI's "Proprietary Information."

77.    Upon information and belief, Freedman solicited direct employment at Zuora, and used and continues to use ENKI's Proprietary Information in furtherance of his work at Zuora and to the detriment of the Company's own service offerings.

78.    Section 9.3 as incorporated into the Separation Agreement contains enforceable non-competition provisions pursuant to California Business and Professions Code § 16601, as the Separation Agreement involved the buy-back of Freedman's substantial ownership interest, represented the goodwill of ENKI, and because ENKI carries on a business that is like and similar to that which it conducted when Freedman sold all of his ownership interest to the Company.

1    79.    As a direct and proximate result of Freedman's breach of the
2    covenants of non-competition, Plaintiff has suffered damages in an amount to be
3    determined at trial, and, pursuant to Section 9.3(D), is entitled to injunctive relief
4    and attorneys' fees.

5    80.    ENKI has also suffered and continues to suffer irreparable
6    injury from these acts, and due to the continuing threat of such injury, has no
7    adequate remedy at law, entitling ENKI to injunctive relief.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

### (By Plaintiff for Breach of Contract Against Freedman)

81.    Plaintiff repeats and realleges each and every allegation set
forth in the foregoing paragraphs as if same were fully set forth herein.

82.    At all times relevant hereto, ENKI performed all of its
obligations under the Separation Agreement, which is a binding and enforceable
agreement between ENKI and Freedman.

83.    Paragraph 7 of the Separation Agreement precludes either
party from disclosing the terms and conditions of the agreement.

84.    Upon information and belief, Freedman conveyed details of
the financial arrangement under the terms of the Separation Agreement to a Zuora
official (and possibly multiple Zuora officials) and further stated that there was
animus between Freedman and ENKI.

85.    Freedman's disclosure of the terms and conditions of the
Separation Agreement constitute a breach of the Separation Agreement.

86.    As a direct and proximate result of Freedman's breach of the
Separation Agreement, Plaintiff has suffered damages in an amount to be
determined at trial.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

### (By Plaintiff for Breach of Contract Against Freedman)

87. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if same were fully set forth herein.

88. At all times relevant hereto, ENKI performed all of its obligations under the Separation Agreement, which is a binding and enforceable agreement between ENKI and Freedman.

89. Paragraph 8 of the Separation Agreement precludes either party from "criticiz[ing], denigrat[ing], or disparag[ing] the other party (including, in the case of ENKI, its directors, officers and employees)."

90. As set forth above, Freedman made disparaging comments to employees and officers of Zuora about ENKI that have served to detrimentally affect Zuora's attitude towards the Company.

91. Freedman's conduct in disparaging, denigrating, and criticizing ENKI constitutes a breach of the Separation Agreement.

92. As a direct and proximate result of Freedman's breach of the Separation Agreement, Plaintiff has suffered damages in an amount to be determined at trial.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

### (By Plaintiff for Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code Section 3426 et seq.) Against All Defendants)

93. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if same were fully set forth herein.

94. At all relevant times, and as set forth above, ENKI was in possession of trade secrets and confidential information as defined by California Civil Code § 3426.1(d). Among other things, ENKI's confidential and proprietary

techniques for use of Infiniband and the other Proprietary Information constitute a trade secret under the California Uniform Trade Secrets Act because ENKI derives independent economic value from this confidential and trade secret information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information has been the subject of reasonable efforts by ENKI to maintain its secrecy.

95. Freedman, through Freeform, and in concert with Zuora, has misappropriated ENKI's trade secrets and Proprietary Information, by using ENKI's trade secret and confidential information to directly compete with ENKI's services, giving Defendants an economic advantage that they would not have had without the confidential information.

96. As a proximate result of said acts of misappropriation and use of ENKI's trade secrets, ENKI has lost profits and will continue to lose profits until Defendants are enjoined from using ENKI's trade secrets.

97. As an additional proximate result of Defendants' acts of misappropriation and use of ENKI's trade secrets, ENKI is informed and believes that Defendants have been unjustly enriched in an amount subject to proof at trial.

98. As an additional proximate result of Defendants' acts of misappropriation, ENKI has sustained, and will continue to sustain, great and irreparable injury in that ENKI will lose customers and good will. ENKI has no adequate remedy at law for these injuries. Unless Defendants are restrained from using the confidential and Proprietary Information in the future, ENKI will be compelled to bring a multiplicity of suits to protect its interests. Upon information and belief, Defendants committed their acts of misappropriation willfully and maliciously in that Defendants intended by their conduct to drive ENKI out of its relationship with Zuora so as to render the need for its Proprietary Information services unnecessary. Defendants' conduct entitles Plaintiff to recover an award of

exemplary damages in an amount equal to twice Plaintiff's actual damages as well as reasonable attorneys' fees.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF

**(By Plaintiff for Intentional Interference with Contractual Relations Against Defendants Freedman, Freeform, and DOES 1 through 100)**

99.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if same were fully set forth herein.

100.    A valid contract existed between ENKI and Zuora.

101.    Defendant Freedman, Freeform, and DOES 1 through 100 were fully aware of the agreement between ENKI and Zuora.

102.    Defendants Freedman, Freeform, and DOES 1 through 100 were not parties to this contract or otherwise beneficiaries of the contract that had any direct interest in this contract.

103.    Notwithstanding such knowledge, these defendants willfully engaged in conduct designed to disrupt the relationship between ENKI and Zuora. Separate and apart from any conduct the Defendants engaged in that constitutes misappropriation of trade secrets, the Defendants engaged in other independently wrongful conduct that interfered with ENKI's relationship with Zuora.   This distinct set of wrongfully interfering activities includes disparaging ENKI (in breach of contractual obligations), soliciting ENKI (also in breach of its contractual obligations), by using the confidential and Proprietary Information that Freedman had obtained through his employment at ENKI (also in breach of his contractual obligations), and wrongfully accessing ENKI's servers in breach of the federal Computer Fraud and Abuse Act and California's Penal Code.

104.    Defendants Freedman, Freeform, and DOES 1 through 100 were not employees of either ENKI or Zuora at the time they intentionally interfered with the contract between them.

1    105.    Such wrongful conduct caused an actual disruption of the
2    contractual relationship between ENKI and Zuora because, upon information and
3    belief, Freedman led Zuora to believe that ENKI was doing a less-than stellar job
4    (even though that was not the case) and otherwise disparaged ENKI in front of
5    Zuora personnel.

6    106.    Such wrongful conduct was taken by Freedman and Freeform
7    to further Freedman and Freeform's own economic interests (outside the scope of
8    any contractual relationship they had with ENKI, pursuant to the Purchase Order,
9    and in breach of contractual obligations they owed to ENKI pursuant to the
10   Separation Agreement) and not the interests of ENKI or Zuora.  Accordingly, such
11   conduct is not privileged in any way and was certainly not done at the instruction
12   of ENKI or in any capacity as a purported agent of ENKI (which Freedman and
13   Freeform were not).

14   107.    As a direct and proximate cause of Defendants' conduct, ENKI
15   has suffered economic loss, and is entitled to damages resulting from the loss of
16   its contractual relationship with Zuora, in an amount to be determined at trial.

17
18   **EIGHTH CLAIM FOR RELIEF**
19   **(By Plaintiff for Unfair Competition Under Business & Professions Code**
20   **Section 17200 et seq. Against All Defendants)**

21   108.    Plaintiff repeats and realleges each and every allegation set
22   forth in the foregoing paragraphs as if same were fully set forth herein, except for
23   those allegations set forth in paragraphs 94-98.

24   109.    This claim for relief is based upon the wrongful conduct by
25   Defendants that is separate and distinct from Defendants' acts of misappropriation
26   of trade secrets alleged in the Sixth Cause of Action above.

27   110.    The wrongful conduct that is the basis for this claim is
28   Defendants' conduct which constitutes breaches of contract, interference with

contract, disparagement of ENKI, and violations of the Computer Fraud and Abuse Act and California's Penal Code.

111. Defendants' conduct alleged above was unfair, fraudulent, and unlawful, and therefore constitutes unlawful and unfair business acts which significantly threaten and/or harm competition and constitutes unfair competition in violation of California's Business & Professions Code § 17200, et seq.

112. Plaintiff is entitled to Court orders against Defendants as necessary to prevent this unfair competition, including an injunction and, if necessary, for restitution and disgorgement of any funds received, which are necessary to restore money or property to Plaintiff that were acquired by Defendants by means of unfair competition.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment in its favor and against Defendants Freedman, Freeform, Zuora, and the Doe Defendants as appropriate to the claim, and specifically for relief as follows:

1. Compensatory Damages, in a sum according to proof;

2. Exemplary or Punitive Damages, in a sum according to proof;

3. An Order to protect Plaintiff's trade secrets and Proprietary Information;

4. An Order to prevent Defendants from unfairly competing with Plaintiff;

5. An accounting from Defendants of their use of Plaintiff's trade secrets and Proprietary Information for their benefit;

6. An order and judgment that Defendants pay restitution based on their own unjust enrichment and disgorge and restore all funds received by means of their unfair, unlawful and fraudulent acts and practices;

7.    A constructive trust for the benefit of Plaintiff to be imposed upon all funds, assets, revenues and profits Defendants have or will derive from their unfair, unlawful and fraudulent acts and their misappropriation of Plaintiff's trade secrets and Proprietary Information;

8.    A temporary restraining order, preliminary injunction and permanent injunction each enjoining Defendants, and each of them, and each of their agents, employees, and/or representatives, and any and all persons or entities acting under their direction and control, from, without further order of the Court or Plaintiff's written consent:

(a)    accessing Plaintiff's servers, computers, networks, or any other repositories of Plaintiff's trade secret and Proprietary Information;

(b)    using or disclosing in any fashion any of Plaintiff's trade secrets or Proprietary Information; and

(c)    refusing to return all documents and files (electronic, computer, or hard copy) that reflect or include any of Plaintiff's trade secrets or Proprietary Information;

9.    A temporary restraining order, preliminary injunction and permanent injunction each enjoining Freedman, and each of his agents, employees, and/or representatives, and any and all persons or entities acting under his direction and control, from, without further order of the Court or Plaintiff's written consent, continuing to unlawfully compete with Plaintiff by soliciting and working with Zuora, or any of Plaintiff's other customers who are subject to the terms of the Separation and Operating Agreements;

10.    Prejudgment interest;

11.    Attorneys' fees pursuant to Civil Code Section 3426.4, Penal Code Section 502(e), and contract;

12.    Costs of suit; and

13.    Such other and further relief as the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all matters so triable.

DATED:   August 12, 2013

HERRICK, FEINSTEIN LLP
David Feuerstein (admitted *pro hac vice*)
Jessica Natbony (admitted *pro hac vice*)

KAWAHITO SHRAGA & WESTRICK LLP
David R. Shraga

By: /s/ David R. Shraga
      DAVID R. SHRAGA

Attorneys for Plaintiff
ENKI CORPORATION