HERRICK, FEINSTEIN LLP
David Feuerstein (admitted *pro hac vice*)
E-mail: dfeuerstein@herrick.com
Jessica Natbony (admitted *pro hac vice*)
E-mail: jnatbony@herrick.com
Marisa Leto (admitted *pro hac vice*)
E-mail: mleto@herrick.com
2 Park Avenue
New York, New York 10016
Telephone:  (212) 592-1400

KAWAHITO SHRAGA & WESTRICK LLP
David R. Shraga (SBN 229098)
E-mail: dshraga@kswlawyers.com
1990 S. Bundy Dr., Ste. 280
Los Angeles, California 90025
Phone: (310) 746-5300
Facsimile: (310) 593-2520

Attorneys for Plaintiff ENKI Corporation

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENKI, CORPORATION (f/k/a ENKI, LLC)<br><br>Plaintiff,<br><br>vs.<br><br>KEITH FREEDMAN et al.,<br><br>Defendants. | Case No.:   5:13-CV-02201-PSG<br><br>**DECLARATION OF DAVID DURKEE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**<br><br>[OPPOSITION TO MOTION TO DISMISS FILED CONCURRENTLY HEREWITH] |

I, David Durkee, being duly sworn, deposes, and says:

1.      I am the CEO of ENKI Corporation ("ENKI"). I submit this affidavit in support of Plaintiffs' opposition to Defendants' Joint Motion to Dismiss, dated August 26, 2013. I have personal knowledge of the facts set forth herein.

2.      I understand that Defendants have moved to dismiss ENKI's First Amended Complaint (the "FAC") and have argued that ENKI cannot state a claim for "unauthorized access" under the Federal Computer Fraud and Abuse Act because Zuora owns the hardware (i.e., the computers and servers) on which ENKI's proprietary information was located. Such an argument, however, seems to ignore the fact that ENKI (i) owned the rights to Nimsoft and the Nimsoft server and (ii) expressly told Defendants that they were not to access Nimsoft or the Nimsoft server.   Moreover, Defendants seem to ignore the contractual restrictions set forth in the parties' agreements and the technical barriers that ENKI set in place to prevent non-ENKI personnel from accessing the Nimsoft servers. As such, Defendants' motion to dismiss should be denied.

### The Terms of ENKI's Retention

3.      In early 2012, Zuora engaged ENKI to provide cloud computing and other IT services, including the monitoring of ENKI's data centers. The services to be performed by ENKI were memorialized in a master services agreement dated January 4, 2012 (the "MSA") and a statement of work dated as of February

- 1 -

2012 (the "SOW"). A true and correct copy of the MSA and SOW are annexed hereto as Exhibits "A" and "B," respectively.

4.     These agreements explicitly distinguished between the intellectual property that ENKI owned (and would continue to own after the termination of the MSA-SOW) and the intellectual property that Zuora would ultimately acquire. Such distinctions are important in the IT field in order for companies to protect their trade secrets.

5.     For purposes of this motion, it is important to note that the MSA-SOW made clear that ENKI owned, and would continue to own, any "software design and coding" that it did in connection with providing its services (because such work was defined as "Out of Scope" work in the SOW and, therefore, did not constitute "Client Work Product" under the MSA).

- 2 -

### Nimsoft

6.    As part of its monitoring of Zuora's data center, ENKI and Zuora agreed to use Nimsoft, a software system that is produced by Computer Associates. ENKI holds the license to use this product.

7.    Nimsoft is used to monitor the resources and performance in a computer system (such as CPU usage and frequency, the amount of free memory (RAM), and performance and availability of software applications that Zuora used to services its clients), and displays such performance metrics to the end user (in this case, Zuora).

8.    Typically, ENKI loads the Nimsoft software onto a designated server that is then connected to its client's data system.  Aside from providing better functionality, loading Nimsoft onto its own server allows ENKI to ensure that its intellectual property is protected (because non-ENKI employees are not permitted to access that server without an appropriate password).

9.    In this case, ENKI used "virtual servers" -- i.e., a commercially available software product that is programmed to function like typical hardware servers sold in stores[1] -- and loaded these virtual servers onto a hardware server owned by Zuora.  These virtual servers (which are referred to as "Nimsoft servers" in the FAC) were wholly independent of the servers owned by Zuora. Indeed, they had separate log-in information, were password protected, and

---

[1] Notably, ENKI created these "virtual servers" by using a template provided to it by Zuora.

- 3 -

appeared to outsiders as wholly separate and distinct servers from those owned by Zuora.

10. ENKI then loaded the Nimsoft software onto the Nimsoft servers to monitor Zuora's data systems. As is typical with ENKI's clients, Zuora provided ENKI with certain parameters that Zuora wanted to monitor to run its own software most efficiently. ENKI then used its trade secret and proprietary know-how to program Nimsoft to meet Zuora's needs.

11. The codes and scripts that ENKI used to program Nimsoft are, by definition, "software design and coding" and, therefore, remained ENKI's proprietary information. In fact, the SOW made clear that "[a]ny non-Zuora software . . . or tools owned and utilized by ENKI for delivering the Services [such as Nimsoft] . . . shall remain the property of ENKI." (*See* Ex. A.) The SOW further stated that "ENKI shall retain sole root login capability to Client servers, including management and application infrastructure" (meaning that ENKI -- and only ENKI -- could access Nimsoft as the "administrator"). (*Id.*)

12. Moreover, ENKI repeatedly told Zuora that it could not access the Nimsoft servers or software because the information contained thereon constituted ENKI's proprietary information.

13. ENKI repeatedly rejected Zuora's requests to access Nimsoft in order to protect its proprietary information and also to ensure it was effectively

- 4 -

1    providing its services to Zuora.  For example, Zuora requested access shortly after

2    the execution of the SOW and ENKI rejected the request, explaining that such

3
     access would compromise ENKI's ability to hold the liability for the SLA
4
5    response.  In other words, if Zuora had any access to Nimsoft, ENKI could no

6    longer ensure that the monitoring system would perform as required (which is

7
     precisely what Zuora had hired ENKI to do).
8
9                              **ENKI's Damages**

10   14.    After Defendants improperly accessed Nimsoft, ENKI (i) assessed

11
     what Defendants had done and the functionality of the Nimsoft system, and (ii) re-
12
13   secured the Nimsoft servers to prevent future theft.  This work cost ENKI more

14   than $9,000.00 in man hours and costs.

15
     15.    The $9,000.00 does <u>not</u> include the legal fees ENKI has expended to
16
17   date or the hundreds of thousands of dollars that ENKI has lost in service fees that

18   Zuora would have been required to pay (but for its improper access of ENKI's

19
     proprietary information) and the services fees that Zuora still owes ENKI by
20
21   virtue of its termination of the MSA-SOW.  Indeed, Zuora did not dispute that it

22   owed ENKI certain payments but failed to make them once this action was

23
     commenced.
24
25   16.    Indeed, I believe that Zuora wanted (and ultimately, obtained) access

26   to the Nimsoft servers because without such access Zuora could not obtain

27

28                                    - 5 -

ENKI's proprietary information, including the customized codes and scripts that were necessary to monitor Zuora's services.   Without ENKI's proprietary information, Zuora would have had to create its own monitoring system from scratch, which it knew would be costly and take many man hours to accomplish. And the longer Zuora took to create its own monitoring system, the longer Zuora would be exposed to potential liability from Zuora's clients, who relied upon Zuora for the software services Zuora provided to them.

## **Conclusion**

17.   Based on the foregoing, ENKI respectfully requests that the Court deny Defendants' Joint Motion to Dismiss in its entirety and grant any such further relief the Court deems just and proper.

- 6 -

1         I swear under penalty of perjury under the laws of the United States

2  of America that the foregoing is true and correct.   Executed this 23rd day of

3  September, 2013 at Denver, Colorado.

4

5                              DAVID DURKEE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  HF 8651582v.2                  - 7 -

DECLARATION OF DAVID DURKEE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# EXHIBIT A

MASTER SERVICES AGREEMENT

by and between

ENKI, LLC

and

Zuora, Inc.

Dated as of January 4, 2012

TABLE OF CONTENTS

ARTICLE 1. AGREEMENT FRAMEWORK..........................................................2
    Section 1.01  Purpose..........................................................................2
    Section 1.02  Master Agreement.........................................................2
    Section 1.03  Statements of Work.......................................................2
ARTICLE 2. DEFINITIONS AND INTERPRETATION...................................3
    Section 2.01  Definitions.....................................................................3
    Section 2.02  Interpretation.................................................................6
ARTICLE 3. TERM .........................................................................................6
    Section 3.01  Master Agreement.........................................................6
    Section 3.02  Statements of Work.......................................................6
    Section 3.03  Renewal..........................................................................6
ARTICLE 4. SERVICES .................................................................................6
    Section 4.01  Generally.....................................................................76
    Section 4.02  Use of Facilities...........................................................7
    Section 4.03  Enki Personnel..............................................................7
    Section 4.05  Account Management.....................................................7
    Section 4.06  Compliance With Laws. .................................................7
    Section 4.07  Transition.......................................................................7
    Section 4.08  Subcontractors..............................................................7
    Section 4.08  Quality and Service Levels. ..........................................8
    Section 4.09  Exclusions.....................................................................8
    Section 4.10  Data Security.................................................................8
ARTICLE 5. NEW SERVICES .......................................................................9
    Section 5.01  Enki Opportunity..........................................................9
    Section 5.02  Enki Cooperation with Third Parties. ..........................9
ARTICLE 6. RESPONSIBILITIES.................................................................9
    Section 6.01  Client Managers............................................................9
    Section 6.02  Responsibilities. ..........................................................10
    Section 6.03  Client Resources...........................................................10
ARTICLE 7. SOFTWARE AND PROPRIETARY RIGHTS .........................10
    Section 7.01  Rights in Residuals......................................................10
    Section 7.02  Work Product and Enki Work Product..........................11
    Section 7.03  License and Representation Regarding Work Product...........................11
    Section 7.04  License Regarding Enki Work Product. .........................12
    Section 7.05  License Regarding Enki Third Party Software.................12
    Section 7.06  Disclosure of Work Product.........................................12
ARTICLE 8. PAYMENTS TO ENKI................................................................12
    Section 8.01  Fees...............................................................................12
    Section 8.02  Methods of Calculating Fees; Invoicing; Expenses. ...........................12
    Section 8.03  Taxes.............................................................................13
ARTICLE 9. CONFIDENTIALITY .................................................................13
    Section 9.01  General Obligations......................................................13
    Section 9.02  Exclusions.....................................................................14
    Section 9.03  Unauthorized Acts.........................................................14
    Section 9.04  Injunctive Relief...........................................................15
    Section 9.05  Publicity.......................................................................15
ARTICLE 10. REPRESENTATIONS AND ADDITIONAL COVENANTS .................15
    Section 10.01 Representations By Client...........................................15
    Section 10.02 Representations By Enki. ............................................15

Section 10.03  Mutual Representations.................................................................. 16
Section 10.04  Disclaimers. ................................................................................ 16
ARTICLE 11. DISPUTE RESOLUTION.................................................................. 16
Section 11.01  Continued Performance. ......................................................... 17~~16~~
Section 11.02  Statement of Work. .................................................................. 17~~16~~
Section 11.03  Executive Review. ...................................................................... 17
Section 11.04  Mediation. ................................................................................. 17
Section 11.05  Confidentiality. .......................................................................... 17
Section 11.06  Arbitration. ............................................................................... 17
Section 11.07  Certain Disputes. ...................................................................... 18
Section 11.08  Fees and Costs. ......................................................................... 18
Section 11.09  Provisional Remedies. ............................................................... 18
ARTICLE 12. TERMINATION ................................................................................ 18
Section 12.01  Termination By Enki. ................................................................ 18
Section 12.02  Termination By Client. .............................................................. 19
ARTICLE 13. INDEMNITIES ................................................................................. 20
Section 13.01  Infringement. ............................................................................ 20
Section 13.02  Services. ................................................................................. 21~~20~~
Section 13.02  Personal Injury and Property Damage By Enki. .......................... 21~~20~~
Section 13.03  Personal Injury and Property Damage By Client. ........................ 21
Section 13.04  Indemnification By Client. ......................................................... 21
Section 13.05  Indemnification By Enki. ........................................................... 21
Section 13.06  Indemnification Procedures. ...................................................... 21
Section 13.07  Subrogation. ............................................................................. 22
ARTICLE 14. DAMAGES ....................................................................................... 22
Section 14.01  Direct Damages. ........................................................................ 22
Section 14.02  Consequential Damages. ........................................................ 23~~22~~
Section 14.03  Exclusions and Limitations. ....................................................... 23
Section 14.04  Mitigation. ................................................................................ 23
ARTICLE 15. MISCELLANEOUS PROVISIONS....................................................... 23
Section 15.01  Notices. .................................................................................... 23
Section 15.02  Assignment and Third Party Beneficiaries. .............................. 24
Section 15.03  Relationship. ............................................................................. 24
Section 15.04  Severability and Waivers............................................................ 24
Section 15.05  Survival. ............................................................................... 25~~24~~
Section 15.06  Governing Law. ......................................................................... 25
Section 15.07  Sole and Exclusive Venue. ........................................................ 25
Section 15.08  Force Majeure. .......................................................................... 25
Section 15.09  Nonperformance. ...................................................................... 25
Section 15.10  Right to Provide Services. ...................................................... 26~~25~~
Section 15.11  Right to Manage Performance. .................................................. 26
Section 15.12  Further Assurances. .................................................................. 26
Section 15.13  Solicitation. .............................................................................. 26
Section 15.15  Negotiated Terms....................................................................... 26
Section 15.16  Consents, Approvals and Requests. ........................................... 26
Section 15.17  Entire Agreement; Amendments; Counterparts. .......................... 27

# MASTER SERVICES AGREEMENT

This SERVICES AGREEMENT (this "Master Agreement") is by and between ENKI, LLC ("Enki") and Zuora, Inc ("Client"), and shall be effective as of January 4, 2012 (the "Master Agreement Date") and shall continue until January 4, 2014 (the "Initial Master Agreement Expiration Date"), unless otherwise terminated earlier or extended beyond such date, each in accordance with the provisions of this Master Agreement.

WHEREAS, Client's contact information is as follows:

Zuora, Inc.
Attn: CFO
3400 Bridge Parkway, Suite 101
Redwood City, CA 94065
Telephone: 650 249-4336
Facsimile:

WHEREAS, Client has engaged Enki to provide consulting, cloud computing operations and other enterprise-grade IT services, including in the installation of physical infrastructure (potentially including, but not limited to, computers, storage, associated software) and the remote operation of such infrastructure, all as more fully described in a mutually agreed upon Statement of Work (the "Services"); and

WHEREAS, the purpose of this Master Agreement is to establish the general terms and conditions applicable to Enki's provision of Services to Client for which the Parties shall enter into specific Statements of Work.

NOW, THEREFORE, for and in consideration of the agreements set forth below, Enki and Client hereby agree as follows:

## ARTICLE 1. AGREEMENT FRAMEWORK

1.01.  Purpose.  The purpose of this Master Agreement is to establish the general terms and conditions applicable to Enki's provision of consulting, cloud computing and operations Services to Client and Client Affiliates for which Enki and Client shall have entered into one or more Statements of Work to this Master Agreement describing the responsibilities and obligations specific to the applicable Services in a form mutually agreed to by the parties (the "Statement of Work").

1.02.  Master Agreement.  This Master Agreement is intended to serve as a framework for the provision of Services under one or more Statements of Work. Enki shall only be obligated to provide those services agreed to by the parties under an executed Statement of Work.

1.03.  Statements of Work.  The Statements of Work shall reference and incorporate this Master Agreement, and the terms and conditions set forth in this Master Agreement shall govern

2

Enki's provision of services under the Statements of Work, except as they may be amended by a Change Order in respect of the specific services being provided under such Statement of Work.

## ARTICLE 2.  DEFINITIONS AND INTERPRETATION

2.01.   <u>Definitions</u>.  Unless otherwise defined in a Statement of Work, the defined terms used in this Master Agreement and the Statements of Work shall have the following meanings.

"<u>Change Order</u>" shall mean a document agreed upon by the Parties (1) implementing a Change or (2) adding a New Service under a Statement of Work.

"<u>Client</u>" shall have the meaning set forth in the Preamble.

"<u>Client Affiliate</u>" shall mean any entity that, directly or indirectly, Controls, is Controlled by or is under common Control with Client.

"<u>Client Contact</u>" shall have the meaning set forth in Section 6.01.

"<u>Client Machines</u>" shall mean the Machines owned or leased by Client.

"<u>Client Network</u>" shall mean Client internal computing network.

"<u>Client Proprietary Software</u>" shall mean the Software owned or developed by or on behalf of Client.

"<u>Client Representatives</u>" shall mean Client Affiliates, and employees, officers, directors, subcontractors, suppliers and agents of Client and Client Affiliates, including the Client Contact.

"<u>Client Software</u>" shall mean the Client Proprietary Software and the Client Third Party Software, collectively.

"<u>Client Third Party Software</u>" shall mean the Software licensed or leased by Client from a third party.

"<u>Confidential Information</u>" shall mean (1) with respect to Client (a) any technical and non-technical information related to the Client's business and current, future and proposed products and services of Client, including for example and without limitation, information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information, marketing plans and business plans and (b) any information that may be made known to Enki and which Client has received from others that Client is obligated to treat as confidential or proprietary, whether or not marked as confidential, including but not limited to any data relating to Client's customers, (2) with respect to Enki shall mean any source code to Enki Software which may be provided pursuant to a Statement of Work, (3) with respect to both Parties, the terms and conditions of this Agreement and all Statements of Work, provided

3

that Client is free to share this Agreement and Statements of Work with third parties which may succeed Enki in providing services similar to the Services.

"Consents" shall mean all licenses, consents, authorizations and approvals that are necessary to allow each Party and its Representatives to use owned, licensed and leased assets of the other Party.

"Enki" shall mean Enki, LLC, a California limited liability company having its principal place of business at 1049-C El Monte Avenue, Suite #32, Mountain View, CA 94040.

"Enki Contact" shall have the meaning set forth in Section 4.03.

"Enki Key Employees" shall mean the Enki Contact and such other positions as may be identified from time to time by mutual agreement.

"Enki Machines" shall mean the Machines owned or leased by Enki that are used in connection with the Services.

"Enki Proprietary Software" shall mean the Software owned or developed by or on behalf of Enki, whether or not utilized in connection with the Services.

"Enki Representatives" shall mean Enki employees, officers, directors, subcontractors, suppliers and agents of Enki, including the Enki Contact.

"Enki Software" shall mean the Enki Proprietary Software and the Enki Third Party Software, collectively.

"Enki Staff" shall mean the employees, officers, managers and subcontractors of Enki assigned to a particular Statement of Work.

"Enki Third Party Software" shall mean the Software licensed or leased by Enki from a third party that is used in connection with the Services.

"Enki Work Product" shall have the meaning set forth in Section 7.02.

"Fees" shall have the meaning set forth in Section 8.01 of this Master Agreement.

"Force Majeure Event" shall have the meaning set forth in Section 15.08.

"Governmental Authority" shall mean any international, national, provincial, municipal, local, territorial or other governmental department, regulatory authority, judicial or administrative body, domestic, international or foreign.

"Indemnified Party" shall have the meaning set forth in Section 13.01.

"Indemnifying Party" shall have the meaning set forth in Section 13.01.

4

"Initial Master Agreement Expiration Date" shall have the meaning set forth in the Preamble.

"Law" shall mean any declaration, decree, directive, legislative enactment, order, ordinance, regulation, rule or other binding requirement of or by any Governmental Authority.

"Losses" shall mean any and all damages, fines, penalties, deficiencies, losses, liabilities (including settlements and judgments) and expenses (including interest, court costs, reasonable fees and expenses of attorneys, accountants and other experts or other reasonable fees and expenses of litigation or other proceedings or of any claim, default or assessment).

"Machines" shall mean computers and related equipment, including central processing units and other processors, controllers, modems, communications and telecommunications equipment (voice, data and video), cables, storage devices, printers, terminals, other peripherals, input and output devices, and other tangible mechanical and electronic equipment intended for the processing, input, output, storage, manipulation, communication, transmission and retrieval of information and data.

"Master Agreement" shall have the meaning set forth in the Preamble.

"Master Agreement Date" shall have the meaning set forth in the Preamble.

"New Service(s)" shall mean (a) any service that is not expressly included in Schedule A to the relevant Statement of Work and that Enki has the capability of performing or (b) services included in Schedule A to this Master Agreement but which are to be provided to an entity not receiving such Services as of Master Agreement Date.

"Parties" or "Party" shall mean Client and Enki, collectively, or either Client or Enki, as the case may be.

"Project Staff" shall mean the personnel of Enki and Enki Representatives who provide the Services.

"Related Documentation" shall mean, with respect to Software, all materials, documentation, specifications, technical manuals, user manuals, flow diagrams, file descriptions and other written information that describes the function and use of such Software, as applicable.

"Renewal Period" shall have the meaning set forth in Section 3.03.

"Representatives" shall mean Client Representatives or Enki Representatives, as the case may be.

"Service Levels" shall mean the quantitative and qualitative performance levels used to measure Enki's performance of services, as further described in any Statement of Work.

5

"Services" shall have the meaning set forth in the Statement of Work.

"Software" shall mean the object code versions of any applications programs, operating system software, computer software languages, utilities, other computer programs and Related Documentation, in whatever form or media, including the tangible media upon which such applications programs, operating system software, computer software languages, utilities, other computer programs and Related Documentation are recorded or printed.

"Statement(s) of Work" shall have the meaning set forth in Section 1.01, and each such Statement of Work shall be incorporated into, and be part of, this Master Agreement.

"Systems" shall mean the Software and the Machines, collectively, used to provide the Services.

"Use" shall mean the right to load, execute, store, transmit, display, copy, make and have made copies of, maintain, and repair the Work Product.

"Work Product" shall have the meaning set forth in Section 7.02.

2.02.   Interpretation. For purposes of this Master Agreement and the Schedules to this Master Agreement, the Schedules to this Master Agreement shall be incorporated into and deemed part of this Master Agreement and all references to this Master Agreement shall include the Schedules to this Master Agreement. In the event of a conflict between the terms of this Master Agreement and the terms of a Statement of Work, the terms of the Statement of Work shall prevail; provided that no Statement of Work may amend the term of this Master Agreement.

## ARTICLE 3.  TERM

3.01.   Master Agreement.  The term of this Master Agreement shall commence on the Master Agreement Date and continue until the later of: a) the Initial Master Agreement Expiration Date, unless otherwise renewed pursuant to Section 3.03 or terminated pursuant to the terms of this Master Agreement; or b) for each Statement of Work, until expiration of a term, if any, specified in such Statement of Work.

3.02.   Statements of Work.  Enki shall provide the Services during the applicable terms of the Statements of Work.

3.03.   Renewal. This Master Agreement may be renewed by Client for up to three additional one-year periods (each a "Renewal Period") in accordance with this Section. Unless this Master Agreement is terminated earlier, Each Party shall notify the other Party pursuant to this Section at least 90 days prior to the Initial Master Agreement Expiration Date, or if in a Renewal Period at least 90 days prior to the expiration date of such Renewal Period, as to whether a Party desires to not renew this Master Agreement.

## ARTICLE 4.  SERVICES

6

4.01.  _Generally._ Commencing as of the Master Agreement Date and continuing throughout the term of this Master Agreement, Enki shall be the provider of, Client shall purchase from Enki, and Enki shall perform the Services, all upon and subject to the terms and conditions set forth in this Master Agreement and the Statements of Work. The Parties' respective functions and responsibilities include those (i) described by the text, (ii) identified by charts or responsibility matrices, and (iii) not specifically described but required for proper performance and inherent in or necessary sub-tasks for the functions described.

4.02.  _Use of Facilities._ While on Client's premises, Enki shall (a) comply with the reasonable requests, standard rules and regulations of Client regarding safety and health and personal and professional conduct generally applicable to such premises and (b) otherwise conduct themselves in a businesslike manner.

4.03.  _Enki Personnel._ During the term of this Master Agreement, Enki shall maintain an individual (the "Enki Contact") who shall serve as the primary Enki representative under this Master Agreement and any Statements of Work. The Enki Contact (or in his or her absence, his or her designee) shall (a) have overall responsibility for managing and coordinating the performance of Enki's obligations under this Master Agreement and the Statements of Work and (b) be authorized to act for and on behalf of Enki with respect to all matters relating to this Master Agreement and the Statements of Work.

4.04.  _Account Management._ Throughout the term, the Client Contact and the Enki Contact shall meet periodically, at such intervals as they may deem advisable, or as may be specified by the relevant Statement of Work, to review the performance of the relevant Statement of Work. All such meetings shall take place at mutually agreeable locations, or if mutually agreed, by telephone conference call or video conference.

4.05.  _Compliance With Laws._ Each Party will comply with applicable Laws, and advise the other of changes in Laws that concern the conduct of its business and affect performance of the Services. Each Party shall obtain and maintain all governmental approvals required to conduct its business and perform its obligations under this Master Agreement and all Statements of Work.

4.06.  _Transition._ In connection with each Statement of Work, each Party shall perform all functions and services within its responsibility and necessary to accomplish the Services without causing a material disruption in Client business.

4.07.  _Subcontractors._

(1)  No subcontracting shall release Enki from its responsibility for its obligations under this Master Agreement or any Statement of Work. Enki shall be responsible for the work and designated activities of each of its subcontractors, including compliance with applicable terms of this Master Agreement and any Statement of Work. Enki shall be responsible for all payments to its subcontractors.

(2)     Enki shall promptly pay for all services, materials, equipment and labor used by Enki in providing the Services and shall indemnify Client from, and defend Client against, any liabilities or expenses (including reasonable attorneys' fees and expenses) connected with Enki's failure to promptly pay for such services, materials, equipment or labor and shall keep the premises of Client free of all liens.

(3)     All subcontractors shall comply with the provisions of this Master Agreement and the relevant Statement of Work such as provisions concerning confidentiality, protection of customer data, compliance with customer policies, audit, change control, security, use of facilities and such other requirements as may be required or appropriate for subcontractors.

4.08.   Quality and Service Levels.  Enki will deliver good quality service that meets or exceeds agreed Service Levels specified by Statements of Work. Where no specific Service Levels apply, Enki will use commercially reasonable efforts to provide services that meet or exceed industry standards. All Services shall be performed by individuals with suitable training and skills.

4.09.   Exclusions.  Degradations of performance shall not constitute Enki's failure to meet applicable Service Levels to the extent that any such failure is attributable to any one or more of the following causes:

(1)     Force Majeure Events;

(2)     Client acts or omissions (including, among other things, violations of Law, willful misconduct, negligent acts or breaches of this Master Agreement or a Statement of Work;

(3)     Acts or omissions of Client third party contractors other than Enki or Enki Affiliates or Enki Staff (including, among other things, violations of Law, negligent acts or breaches of applicable agreements);

(4)     Infringements of third party proprietary rights by Client or its third party contractors other than Enki or Enki Affiliates or Enki Staff;

(5)     Service or resource changes requested or approved by Client and not approved by ENKI; and

(6)     Client failure to take corrective action on items that fall solely within Client responsibility and are reasonably requested and identified by Enki in writing to Client as essential to maintain Service Levels.

Enki will make commercially reasonable efforts to mitigate the effects of the foregoing circumstances.

4.10 Data Security.  At all times during the term of this Master Agreement, Enki shall (a) maintain appropriate technical and organizational measures to protect Secure Information that it

8

uses under the terms of this Master Agreement against unauthorized or unlawful transfer, processing or alteration and against accidental access, loss, damage, processing, use, transfer or destruction; (b) provide reliable and secure systems operated by or on behalf of Enki that capture, transmit or process Secure Information in connection with this Agreement; and (c) comply with all applicable privacy and data protection Laws governing Client, contractor, Client customer and/or employee data.   Additionally, Enki shall comply with Client's Data Security, Data Storage, Data Retention, Password Control and such other policies as required by Client to maintain compliance with Client's Payment Card Industry Data Security Standards (PCI DSS) and SAS70 / SSAE 16 practices. Enki shall complete a background check, at Enki's expense and in a manner prescribed by Client, for all Enki employees and subcontractors who shall be engaged in projects for Client. In the event of a breach of any such data security provisions or other loss of Secure Information, Enki shall provide Client with immediate notification of the breach, any information related to the source of the breach, the Secure Information affected and any such information as required by Client to mitigate any damages related to the breach. Enki shall fully cooperate in Client's investigation of any such breach, and, if applicable, the prosecution of any criminal acts related to the breach, whether such acts were committed by a third party or an employee, agent of Enki. Enki shall require that anyone engaged in the performance of Service for Client shall attend Client's Security Training.

**ARTICLE 5.  NEW SERVICES**

5.01   Enki Opportunity.  With respect to any New Service for which Enki has been selected to provide to Client, Enki shall not be responsible for providing such New Service until Enki and Client have executed a Change Order or entered into a new Statement of Work, as the case may be, including Enki's charges for such New Service.

5.02   Enki Cooperation with Third Parties. In the event Client selects a third party to provide a New Service, upon Client's request and reasonable notice, Enki shall cooperate with any independent third party service vendors of Client; provided, however, that (1) such cooperation does not impact the Services and (2) Enki shall not be required to disclose any of Enki's Confidential Information to such third party service provider unless such third party executes a confidentiality agreement in a form acceptable to Enki and such third party's use of such Confidential Information is solely for the benefit of Client. There may be charges to Client for incidental consultations, electronic copies of data and documentation or other minor or incidental additional effort or service provided in connection with provision of a New Service by a third party, and Client will be required to pay in accordance with an approved Change Order for material, additional effort or serve at the rates and charges agreed to for the relevant engagements, or if no specific rate or charge has been agreed, then at Enki's standard rates then in effect for similar kinds and volumes of services.

**ARTICLE 6.  RESPONSIBILITIES**

6.01   Client Managers.  During the term of this Master Agreement, Client shall maintain an individual (the "Client Contact") who shall serve as the primary Client representative under this Master Agreement and the Statements of Work. The Client Contact (or in his or her absence, his or her designee) shall (a) have overall responsibility for managing and coordinating the

9

performance of Client obligations under this Master Agreement and the Statements of Work and (b) be authorized to act for and on behalf of Client with respect to all matters relating to this Master Agreement and the Statements of Work.

6.02   Responsibilities.   During the term of each Statement of Work and in connection with Enki's performance of the Services under the Statements of Work, each Party shall, at its expense: (1) be responsible for the obligations and responsibilities set forth in Schedule A to the Statements of Work; (2) upon Enki's request, make available to Enki Client personnel familiar with Client business requirements related to the Services; (3) obtain and comply with the Consents; (4) provide to Enki complete and accurate information regarding Client business requirements in respect of any work to be performed by Enki under the Statements of Work; (5) with respect to Enki, perform the Services and provide any deliverables within the time period specified in this Master Agreement or the Statements of Work (or if no time period is specified within 30 days); (6) respond within the time period specified in this Master Agreement or the Statements of Work (or if no time period is specified within 30 days) to all deliverables presented to Client by Enki for Client approval, which approval shall not be unreasonably withheld or delayed (if Client fails to respond within the relevant period, and thereafter fails to respond within ten days after receiving further written notice, Client shall be deemed to have rejected such deliverable); (6) provide reasonable cooperation; (7) promptly notify the other Party of any (a) third party claims that may have an impact on this Master Agreement or the Statements of Work and (b) invalid or nonexistent licenses; and (8) perform all other obligations described in this Master Agreement and the Statements of Work.

6.03   Client Resources.   Commencing on the effective date of any Statement of Work and continuing for so long as and to the extent that Enki requires the same for the performance of the Services, Client shall provide to Enki, at no charge to Enki:

(1)   the use of mutually agreed upon space in Client's premises that Enki may from time to time request in connection with the performance of the Services; and

(2)   access to, and use of, the Client Machines, the Client Network and the Client Software.

## ARTICLE 7. SOFTWARE AND PROPRIETARY RIGHTS

7.01   Rights in Residuals.   Nothing contained in this Master Agreement or the Statements of Work shall restrict either Party from the use of any ideas, concepts, know-how, methodologies, processes, technologies, algorithms or techniques relating to the Services that either Party, individually or jointly, owns prior to the Master Agreement Date, or develops or discloses under this Master Agreement or a Statement of Work, or develops or obtains independently during the term of this Master Agreement, provided that in doing so such Party does not breach its obligations of confidentiality or infringe the intellectual property rights of the other Party or third parties who have licensed or provided materials to the other Party and provided further, that obligations of confidentiality shall not be construed to restrict a Party's general use of the foregoing kinds of intellectual property (without disclosing Confidential Information specific to the other Party). Except for the license rights contained in this Article,

10

neither this Master Agreement nor any disclosure made hereunder grants any license to either Party to use any patents, copyrights or other intellectual property of the other Party. Each Party reserves all rights in its ideas, concepts, know-how, methodologies, processes, technologies, algorithms, techniques and other intellectual property of every kind and description (except as otherwise expressly agreed in writing) and no provision of this Master Agreement shall be construed to transfer any of such Party's rights in such intellectual property. Notwithstanding the above, Enki acknowledges that the Services performed by Enki are in support of Client Software and that Enki's rights as specified in this Section shall in no event extend to any ideas, concepts, know-how, methodologies, processes, technologies, algorithms or techniques relating to the Client Software.

7.02    Work Product and Enki Work Product. For purposes of this Master Agreement, the term "Work Product" means (collectively and individually) all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress, including but not limited to original technical information, programs for computers or other apparatus, specifications, drawings, records, documentation, reports, materials, concepts, plans, data, discoveries or adaptations, creative works, , and works of authorship or other creative works (written, oral, or otherwise expressed) that are developed, conceived, or acquired by Enki, by Enki Staff, or by authorized agents or representatives of Enki in connection with Services. The term "Work Product" does not include any pre-existing Enki Proprietary Software, technical information, programs for computers or other apparatus, designs, specifications, drawings, records, documentation, reports, materials, concepts, plans, inventions, data, discoveries or adaptations, creative works, trade names or trademarks, and works of authorship or other creative works (written, oral, or otherwise expressed) developed, conceived or acquired by Enki or Enki Staff other than that which has been developed, conceived of or created by Enki, by Enki employees or by authorized agents or representatives of Enki for Client (herein, "Enki Work Product"). Enki hereby reserves and retains ownership of any Enki Work Product that may have been used by Enki in creating the Work Product.

7.03    Ownership and Representation Regarding Work Product. Enki agrees to maintain adequate and current records of all Work Product, which records shall be and remain the property of Client. Enki agrees to promptly disclose and describe to Client all Work Product. Enki hereby does and will assign to Client or Client's designee all of Enki's right, title and interest in and to any and all Work Product and all associated records. To the extent any of the rights, title and interest in and to Work Product cannot be assigned by Enki to Client, Enki hereby grants to Client an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to the Work Product can neither be assigned nor licensed by Enki to Client, Enki hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Client or any of Client's successors in interest. Enki agrees to perform, during and after the term of this Agreement, all acts that Client deems necessary or desirable to permit and assist Client, at its expense, in obtaining, perfecting and enforcing the full benefits, enjoyment, rights and title

11

throughout the world in the Work Product as provided to Client under this Agreement. If Client is unable for any reason to secure Enki's signature to any document required to file, prosecute, register or memorialize the assignment of any rights under any Work Product as provided under this Agreement, Enki hereby irrevocably designates and appoints Client and Client's duly authorized officers and agents as Enki's agents and attorneys-in-fact to act for and on Enki's behalf and instead of Enki to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance and enforcement of rights under such Work Product, all with the same legal force and effect as if executed by Enki. The foregoing is deemed a power coupled with an interest and is irrevocable. The rights and obligations of the parties under this Section shall survive termination of this Master Agreement.

7.04    License Regarding Enki Work Product. To the extent that the Work Product includes Enki Work Product, Enki hereby grants to Client and Client's designees a non-exclusive, royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to such Enki Work Product. Notwithstanding the foregoing, Enki agrees that Enki will not incorporate, or permit to be incorporated, any Enki Work Product into any Work Product without Client's prior written consent. The rights and obligations of the parties under this Section shall survive termination of this Master Agreement.

7.05    License Regarding Enki Third Party Software. To the extent that Enki Third Party Software is incorporated into the Work Product, Enki shall grant to Client a limited, nonexclusive, worldwide, irrevocable license to Use the Enki Third Party Software as incorporated into the Work Product (or as may otherwise be limited in any Statement of Work). The rights and obligations of the parties under this Section shall survive termination of this Master Agreement or the termination of any license or sublicense held by Enki with respect to such Enki Third Party Software. Notwithstanding the foregoing, Enki agrees that Enki will not incorporate, or permit to be incorporated, any Enki Third Party Software into any Work Product without Client's prior written consent.

7.06    Disclosure of Work Product. Enki shall promptly disclose and furnish to Client all Work Product arising in connection with the Services. Except as otherwise provided in this Article 7, Enki and Enki Staff shall keep the Work Product in confidence, shall treat the Work Product as Confidential Information of Client.

**ARTICLE 8. PAYMENTS TO ENKI**

8.01    Fees. In consideration of Enki providing the Services, Client shall pay to Enki the fees and other compensation ("Fees") set forth in each Statement of Work in accordance with the terms and conditions of such Statement of Work, as may be adjusted from time to time pursuant to the terms of this Master Agreement and the Statements of Work.

8.02    Methods of Calculating Fees; Invoicing; Expenses.

12

(1)     Client agrees to pay Enki for Services rendered to and accepted by Client in accordance with the provisions of this Master Agreement and the Statements of Work issued hereunder. Each Statement of Work shall specify whether the Statement of Work shall be billed on an hourly basis with expenses charged separately, or on a fixed bid/job completion basis.

(2)     If the Statement of Work is to be billed on an hourly rate basis, the current hourly billing rate that Enki may invoice shall be stated in the Statement of Work

(3)     Enki shall submit one invoice per month per Statement of Work, with all fees, expenses, or related charges with respect to such Statements of Work including on such invoice. Unless otherwise provided in an individual Statement of Work, if billing on an hourly rate basis, Enki will invoice Client in arrears for all hourly rate charges. Client will pay each invoice, subject to approval by Client of the Services rendered and charges invoiced, within 30 days after receipt of a complete and accurate invoice at the address of Enki listed in Section 15.01.

(4)     Expenses shall be separately listed in each invoice. Enki shall support each request for reimbursement of expenses with itemized receipts.

(5)     From time to time, Enki Staff may be required to travel on behalf of Client. Enki may invoice for expenses related to Enki Staff travel if pre-approved by Client. All travel charges shall be passed-through to Client at cost, net of any refunds, and Enki shall not include any mark-up to such actual costs. Expense reports for approved travel submitted to Client shall include itemized receipts for all expenses.

8.03    Taxes.

(1)     Enki and Client shall each bear sole responsibility for all taxes, assessments and other taxes upon their respective real and personal property and net incomes.

(2)     If requested by Client, Enki and Client shall cooperate to segregate the Fees into the following separate payment streams: (a) those for taxable Services; (b) those for nontaxable Services; and (c) those for which a sales, use or other similar tax has already been paid that otherwise are nontaxable or have previously been subject to tax. However, Client shall be solely responsible for any and all sales, use or other similar taxes. In addition, each of Enki and Client shall reasonably cooperate with the other to more accurately determine a Party's tax liability and to minimize such liability, to the extent legally permissible. Each of Enki and Client shall provide and make available to the other any resale certificates, information regarding out-of-state sales or use of equipment, materials or services, and any other exemption certificates or information requested by a Party.

## ARTICLE 9. CONFIDENTIALITY

9.01    General Obligations.

13

(1)    All Confidential Information relating to or obtained from Client or Enki shall be held in confidence by the recipient to the same extent and in at least the same manner as the recipient protects its own confidential or proprietary information and shall be used by the recipient only for the purposes of performance under this Master Agreement and the Statements of Work.

(2)    Neither Client nor Enki shall disclose, publish, release, transfer or otherwise make available Confidential Information of, or obtained from, the other in any form to, or for the use or benefit of, any person or entity without a Party's consent. Each of Client and Enki shall, however, be permitted to disclose relevant aspects of the other's Confidential Information to its officers, directors, employees, auditors, attorneys and Representatives, to the extent that such disclosure is not restricted under this Master Agreement, the Statements of Work or any governmental approvals and only to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under this Master Agreement and the Statements of Work; provided, however, that the recipient shall be responsible for ensuring that such officers, directors, employees, auditors, attorneys and Representatives abide by the provisions of this Master Agreement and the Statements of Work.

9.02    Exclusions. The obligations in Section 9.01 shall not restrict any disclosure pursuant to any applicable Law or by order of any court or Governmental Authority (provided that the recipient shall give prompt notice to a Party of such order) and, except to the extent that applicable Law provides otherwise, shall not apply with respect to information that (1) is independently developed by the recipient without violating a Party's proprietary rights as shown by the recipient's written records, (2) is or becomes publicly known (other than through unauthorized disclosure), (3) is disclosed by the owner of such information to a third party free of any obligation of confidentiality, or (4) is rightfully received by a Party free of any obligation of confidentiality.

9.03    Unauthorized Acts. Without limiting either Party's rights in respect of a breach of this Article, each Party shall:

(1)    promptly notify the other Party of any unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information by any person or entity that may become known to such Party, including any incidents involving a breach of security and any incidents that might indicate or lead to a threat to, or weakness in, security and any attempt to make unauthorized use of the Services or the Systems;

(2)    promptly furnish to the other Party full details of the unauthorized possession, use or knowledge, or attempt thereof, and assist the other Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information;

(3)    cooperate with the other Party in any litigation and investigation against third parties deemed necessary by the other Party to protect its proprietary rights; and

14

(4)     promptly use commercially reasonable efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information.

Each Party shall bear the cost it incurs as a result of compliance with this Section.

9.04    Injunctive Relief. Each Party recognizes that its disclosure or inappropriate use of Confidential Information of the other Party may give rise to irreparable injury to such Party and acknowledges that remedies other than injunctive relief may not be adequate. Accordingly, each Party has the right to equitable and injunctive relief to prevent the unauthorized possession, use, disclosure or knowledge of any Confidential Information, as well as to such damages and other relief as is occasioned by such unauthorized possession, use, disclosure or knowledge.

9.05    Publicity. Neither Party shall use the other Party's name or refer to it directly or indirectly, without such Party's consent, which consent shall not be unreasonably withheld, in any media release, public announcement or public disclosure, except that such consent shall not be required for the use of a Party's name for promotional or marketing materials, customer lists or business presentations.

## ARTICLE 10.  REPRESENTATIONS AND ADDITIONAL COVENANTS

10.01   Representations By Client. Client represents and warrants that:

(1)     It is either the owner of each Client Machine and the Client Software or is authorized by its owner to include it under a Statement of Work;

(2)     It is authorized to permit Enki access to and use of the Client facilities used in connection with performing the Services, and Enki is performing the Services at those Client facilities at Client request; and

(3)     No investigations, legal, administrative or arbitral proceedings are pending or threatened concerning Client's or Client employees' present performance of services similar to those described by Schedule A to this Master Agreement, which performance complies in all material respects with all applicable Laws.

10.02   Representations By Enki.

(1)     It is either the owner of each Enki Machine and the Enki Software or is authorized by its owner to include it under a Statement of Work;

(2)     Enki has all rights necessary to perform the Services and provide the Work Product and the Services and Work Product and Services do not infringe upon the intellectual property rights of a third party;

15

(3)     No investigations, legal, administrative or arbitral proceedings are pending or threatened concerning Enki's present performance of services similar to the Services, which performance complies in all material respects with all applicable Laws;

(4)     The Services and Work Product will, at a minimum, be provided in a timely, workmanlike and professional manner and in accordance with the time frames, directions and criteria as stipulated in the applicable Statement of Work;

(5)     It will continuously monitor and supervise personnel and the Services and Work Product being rendered by them;

(6)     There is no other existing contract or duty on Enki's part that conflicts with or is inconsistent with this Agreement.

(7)     The Services and Work Product do not contain any disabling devices, viruses, trojan horses, trap doors, back doors, Easter eggs, time bombs, cancelbots, or other computer programming routines designed to damage, detrimentally interfere with, surreptitiously intercept or expropriate any other software or data.

(8)     During the term of the Master Agreement, Enki shall maintain the following minimum insurance coverage: (a) all insurance coverage required by law, including workers' compensation insurance; and (b) comprehensive general liability insurance with coverage for property damage (including products/completed services) and personal injury.

10.03   Mutual Representations.  Each Party hereby represents and warrants that:

(1)     it has all requisite corporate power and authority to enter into and deliver this Master Agreement and the Statements of Work, to carry out the transactions contemplated hereby, and this Master Agreement and the Statements of Work are valid and binding obligations of such Party, enforceable against it in accordance with its terms; and

(2)     it shall perform its responsibilities under this Master Agreement and the Statements of Work in a manner that does not, to the knowledge of the applicable Party, infringe, or constitute an infringement or misappropriation of, any patent, trade secret, copyright or other intellectual property right of any third Party.

10.04   Disclaimers.  EXCEPT AS EXPRESSLY SET FORTH IN THIS MASTER AGREEMENT AND ANY STATEMENT OF WORK, ENKI DOES NOT MAKE ANY OTHER WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE SERVICES AND EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A SPECIFIC PURPOSE.

**ARTICLE 11.  DISPUTE RESOLUTION**

16

11.01 <u>Continued Performance</u>. Except where clearly prevented by the issue in dispute and in the event Client fails to pay when due undisputed amounts, both Parties agree to continue performing their respective duties, obligations and responsibilities under this Master Agreement and any Statement of Work while the dispute is being resolved in accordance with this Article, unless and until such obligations are lawfully terminated or expire in accordance with the provisions hereof.

11.02 <u>Statement of Work</u>. Any dispute arising under a Statement of Work shall be considered by the Client Contact and the Enki Contact within seven days of receipt of a notice from either Party specifying the nature of the dispute; provided, however, that a dispute relating to Article 9 shall not be subject to this Section.

11.03 <u>Executive Review</u>. Any dispute arising under this Master Agreement or a Statement of Work that cannot be resolved in accordance with Section 11.02 shall be considered in person or by telephone by a senior executive of each Party within ten days of receipt of a notice from either Party specifying the nature of the dispute; provided, however, that a dispute relating to Article 9 shall not be subject to this Section. Unless the executives of the Parties otherwise agree, either Party may pursue its rights and remedies under Sections 11.04, 11.06 or 11.08 after the occurrence of such meeting or telephone conversation.

11.04 <u>Mediation</u>. If the Parties are unable to resolve a dispute under Sections 11.02 and 11.03, then either Party may refer the dispute to mediation before a mediator reasonably acceptable to both sides, provided, however, that a dispute relating to Article 9 shall not be subject to this Section.

11.05 <u>Confidentiality</u>. Communications, proposals and counter proposals made by either Party during consultations and review in accordance with the foregoing Sections 11.02 through 11.04, inclusive, shall be privileged and confidential offers of compromise within the meaning of Rule 408 of the California Rules of Evidence and Rule 408 of the Federal Rules of Evidence, and shall be inadmissible for any purpose (but this shall not require exclusion of otherwise admissible evidence, such as records of prior performance, merely because it is presented in the course of settlement negotiations). No mediator may be called as a witness by either Party for any purpose, and no mediator's report or recommendation may be admitted into evidence in any proceeding for any purpose.

11.06 <u>Arbitration</u>. Except as otherwise provided below, any dispute not settled pursuant to Sections 11.02 through 11.05 shall be finally and exclusively settled by binding arbitration and, unless otherwise agreed by the Parties, the following procedure:

(1) The arbitration shall be conducted in accordance with the Commercial Arbitration Procedures of the American Arbitration Association then in effect (the "<u>Rules</u>"). In the event of any conflict between the Rules and the provisions of this Section 11, the provisions of this Section 11 shall govern.

(2) There shall be one arbitrator chosen by the Parties or, if they are unable to agree within 30 days after the demand for arbitration, chosen in accordance with the Rules.

17

(3)    The arbitrator shall be (a) retired judges or (b) lawyers, executives or professionals with at least five years experience in software, data processing, or intellectual property law, as appropriate for the particular dispute.

(4)    The arbitration shall be conducted in the State of California.

(5)    Either Party may, without inconsistency with this Master Agreement, seek from a court any interim or provisional relief that may be necessary to protect the rights or property of that Party pending the establishment of the arbitral tribunal.

(6)    The arbitrator(s) shall (by majority vote in cases involving three arbitrators) render a written decision stating reasons therefor in reasonable detail within six months after the respondent receives the demand for arbitration. The award shall be final and enforceable and may be confirmed by the judgment of a court of competent jurisdiction.

(7)    The arbitrators shall have no authority to award punitive damages or any other monetary relief not measured by the prevailing Party's actual damages and will not make any decision inconsistent with the terms and conditions of this Master Agreement or the relevant Statement of Work.

11.07   Certain Disputes.  Claims and controversies concerning the breach, or threatened breach, of provisions of this Master Agreement concerning Confidential Information and intellectual property, including ownership, infringement or misappropriation of proprietary rights may, at the election of either Party, be decided by a court of competent jurisdiction in the State of California to whose exclusive jurisdiction the Parties hereby submit. Promptly following filing of an action contemplated by this Section, any arbitration then pending shall be stayed or terminated, insofar as it concerns such issues.

11.08   Fees and Costs.  In any legal action or arbitration, the prevailing Party shall be entitled to recover, in addition to its damages (subject to limitations stated elsewhere in this Master Agreement), its reasonable attorneys' fees, expert witness fees, costs of arbitration, and other ordinary and necessary costs of litigation, as determined by the court or arbitrators. Such costs include, without limitation, costs of any legal proceedings brought to enforce an arbitral award, judgment or decree.

11.09   Provisional Remedies.  The Parties reserve all rights to obtain provisional remedies that may be available under applicable law from courts of competent jurisdiction, and no application for any such remedy shall be deemed inconsistent with the Parties' obligations to consult with one another, mediate or arbitrate certain disputes, as provided above.

## ARTICLE 12. TERMINATION

12.01   Termination By Enki.

18

(1)     Enki shall have the option, but not the obligation, to terminate this Master Agreement (and/or any Statement of Work affected by the breaches, if any, described below) if: (a) Client fails to pay when due undisputed amounts (including, without limitation, amounts determined pursuant to Article 11 (Dispute Resolution) to be owing to Enki) and Client fails to cure such failure within 30 days after receipt from Enki of written notice thereof; (b) Client materially breaches any of the terms and conditions of this Master Agreement and does not cure the breach within 30 calendar days after receipt of written notice from Enki of the breach. Enki shall exercise its termination option by delivering to Client written notice of such termination identifying the termination date, which shall be at least five days from the date such termination notice is delivered to Client.

(2)     If Enki terminates this Master Agreement pursuant to Section 12.01(1), all Statements of Work then in effect shall simultaneously terminate. If Enki terminates a Statement of Work pursuant to Section 12.01(1), Enki shall have the right, at its option, to simultaneously terminate this Master Agreement and all other Statements of Work. If Enki terminates a Statement of Work but not this Master Agreement pursuant to Section 12.01(1), this Master Agreement and all other Statements of Work shall remain in full force and effect. If Enki terminates a Statement of Work or this Master Agreement, Client shall pay Enki for work properly performed and expenses properly incurred through the date of termination.

12.02   Termination By Client.

(1)     Client shall have the right to terminate this Master Agreement or one or more Statements of Work for cause: (a) if Enki fails to perform any of its material obligations under this Master Agreement or respective Statement of Work(s), as appropriate, and does not cure such default within 30 days receipt of notice; or (b) Enki intentionally and materially infringes, converts or misappropriates any material intellectual property right and fails to cure the infringement or misappropriation (if curable) within 30 days after receiving written notice from Client.

(2)     Client shall have the right to terminate this Master Agreement or a Statement of Work for convenience effective as of any time after the one-year anniversary of the Master Agreement Date by giving Enki notice of the termination at least 90 days prior to the termination date specified in the notice. Notwithstanding the foregoing, Client may not terminate this Master Agreement or any Statement of Work unless Client is current in all undisputed payments then due and payable to Enki.

(3)     Client shall have the option, but not the obligation, to terminate this Master Agreement or, from time to time, one or more affected Statements of Work if Enki fails to perform any Services in any material respects because of a Force Majeure Event and Enki does not cure such failure within 30 days after the occurrence of the Force Majeure Event. Client shall exercise its termination option by delivering to Enki written notice of such termination identifying the termination date. Client shall have no right to terminate pursuant to this Section to the extent that any failure to restore service is attributable to an interruption in or disruption of services provided by Client to Enki.

19

(4)     Client shall have the option, but not the obligation, to terminate this Master Agreement and all Statements of Work in their entirety if Enki becomes or is declared insolvent or bankrupt, is the subject of any voluntary proceeding relating to its liquidation, winding-up, insolvency or the appointment of a receiver, administrator or similar officer (or has such an officer appointed for it), makes an assignment for the benefit of all or substantially all of its creditors or enters into an agreement for the composition, extension or readjustment of all or substantially all of its obligations.

(5)     If Client terminates this Master Agreement pursuant to Section 12.02(1) through 12.02(4), all Statements of Work then in effect shall simultaneously terminate. If Client terminates a Statement of Work pursuant to Section 12.02(1), (3), or (4), Client shall have the right, at its option, to simultaneously terminate this Master Agreement and all other Statements of Work. If Client terminates a Statement of Work but not this Master Agreement pursuant to Section 12.02(1), (3), or (4), this Master Agreement and all other Statements of Work shall remain in full force and effect. If Client terminates this Master Agreement pursuant to Section 12.02(2), all Statements of Work then in effect shall simultaneously terminate and Client shall pay to Enki the aggregate of the termination for convenience fees set forth in each of the Statements of Work.

## ARTICLE 13. INDEMNITIES

13.01   Infringement.   Each Party (an "Indemnifying Party") agrees to indemnify, defend and hold the other Party and its Representatives ("Indemnified Parties") harmless from and against any and all Losses incurred by an Indemnified Party arising from any third party claim of intellectual property infringement asserted against the Indemnified Party by virtue of the Indemnified Party's use of the Indemnifying Party's intellectual property; provided, however, that (1) the Indemnifying Party is given prompt notice of any such claim, (2) has the right to control and direct the defense of such claim and (3) the Indemnified Party fully cooperates with the Indemnifying Party in such defense, all as provided by Section 13.06, below. No Indemnifying Party shall have any liability for any claim of infringement that results from or relates to (a) any modification or enhancement to its intellectual property by an Indemnified Party, (b) any failure by an Indemnified Party to implement or install the Indemnifying Party's intellectual property as directed by the Indemnifying Party, (c) the combination, operation or use of the Indemnifying Party's intellectual property with third party programs, data or documentation and (d) materials, items, resources, or services provided or performed by the Indemnified Party (whether or not used in connection with or incorporated into the Indemnified Party's software). In the event the Indemnifying Party's intellectual property, in the Indemnifying Party's opinion, is likely to or do become the subject of a claim of infringement, the Indemnifying Party shall have the right at its sole option and expense to (i) modify the allegedly infringing intellectual property to be non-infringing, (ii) obtain for the Indemnified Party a license to continue using the allegedly infringing intellectual property or (iii) terminate the license granted hereunder with respect to the allegedly infringing intellectual property and refund to the Indemnified Party the fee paid, if any, for the allegedly infringing intellectual property.

20

13.02  <u>Services</u>.  Enki agrees to indemnify, defend and hold Client harmless, from and against any and all Losses incurred by Client arising from an uncured breach of this Agreement by Enki.

13.03  <u>Personal Injury and Property Damage By Enki</u>.  Enki agrees to indemnify, defend and hold Client harmless, from and against any and all Losses incurred by Client arising from any third party claim for (1) bodily injuries to, including fatal injury or disease to, Enki employees and (2) damage to tangible real or personal property of Enki and Enki employees arising from or in connection with the gross negligence, willful acts or omissions of Enki and its Representatives in connection with this Master Agreement or any Statement of Work.

13.04  <u>Personal Injury and Property Damage By Client</u>.  Client agrees to indemnify, defend and hold Enki and Enki Representatives harmless, from and against any and all Losses arising from any third party claim for (1) bodily injuries to, including fatal injury or disease to, Client employees and (2) damage to tangible real or personal property of Client and Client employees arising from or in connection with the gross negligence, willful acts or omissions of Client and its Representatives in connection with this Master Agreement or any Statement of Work.

13.05  <u>Indemnification By Client</u>.  Client agrees to indemnify, defend and hold Enki and Enki Representatives harmless from and against any and all Losses arising from any third party claim relating to (a) any amounts, including taxes, interest and penalties, that are obligations of Client, (b) due to the gross negligence or willful misconduct by Client that causes liability to any third party and for which Enki is asserted to be responsible by virtue of its responsibilities under this Master Agreement or any Statement of Work, or (c) any violations of U.S. law by Client.

13.06  <u>Indemnification By Enki</u>.  Subject to Section 10.04 above, Enki agrees to indemnify, defend and hold Client and Client Representatives harmless from and against any and all Losses arising from any third party claim relating to: (1) Claims arising out of or related to occurrences Enki is required to insure against pursuant to this Agreement; (2) any breach or default by Enki in the performance of Enki's obligations under agreements with third parties; (3) any breach of Enki's representations and warranties in this Master Agreement or any Statement of Work; (4) any violations of law by Enki; and (5) any business practices or negligent acts or omissions by Enki that cause liability to any third party and for which Client is asserted to be responsible by virtue of its responsibilities under this Master Agreement or any Statement of Work.

13.07  <u>Indemnification Procedures</u>.  If any third party claim is commenced against an Indemnified Party under Sections 13.01 through 13.06, inclusive, notice thereof shall be given to the Indemnifying Party as promptly as practicable. If, after such notice, the Indemnifying Party shall acknowledge that this Section applies with respect to such claim, then the Indemnifying Party shall be entitled, if it so elects, in a notice promptly delivered to the Indemnified Party, but in no event less than ten days prior to the date on which a response to such claim is due, to immediately take control of the defense and investigation of such claim and to employ and engage attorneys reasonably acceptable to the Indemnified Party to handle and defend the same, at the Indemnifying Party's sole cost and expense. Where conflicting interests so require, the

21

Indemnified Party shall have separate counsel, at the Indemnifying Party's expense. The Indemnified Party shall cooperate, at the cost of the Indemnifying Party, in all reasonable respects with the Indemnifying Party and its attorneys in the investigation, trial and defense of such claim and any appeal arising therefrom; provided, however, that the Indemnified Party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defense of such claim and any appeal arising therefrom. No settlement of a claim pursuant to this Section that involves a remedy other than the payment of money by the Indemnifying Party shall be entered into without the consent of the Indemnified Party, which consent shall not be unreasonably withheld. After notice by the Indemnifying Party to the Indemnified Party of its election to assume full control of the defense of any such claim, the Indemnifying Party shall not be liable to the Indemnified Party for any legal expenses incurred thereafter by such Indemnified Party in connection with the defense of that claim. If the Indemnifying Party does not assume full control over the defense of a claim subject to such defense as provided in this Section, the Indemnifying Party may participate in such defense, at its sole cost and expense, and the Indemnified Party shall have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of the Indemnifying Party.

13.08  Subrogation.  In the event that a Party is obligated to indemnify the other Party pursuant to Sections 13.01 through 13.05, the Indemnifying Party shall, upon payment of such indemnity in full, be subrogated to all rights of the Indemnified Party with respect to the claims and defenses to which such indemnification relates.

**ARTICLE 14.  DAMAGES**

14.01  Direct Damages.

(1)   THE ENTIRE LIABILITY OF ENKI AND ENKI REPRESENTATIVES TO CLIENT FOR BREACH OF CONFIDENTIALITY, DATA SECURITY, OR FOR INDEMNIFICATION OF CLIENT FOR ANY THIRD PARTY CLAIMS HEREUNDER, AND THE ENTIRE LIABILITY OF CLIENT AND CLIENT REPRESENTATIVES FOR INDEMNIFICATION OF ENKI FOR ANY THIRD PARTY CLAIMS HEREUNDER, IN EACH CASE, HOWEVER CAUSED, REGARDLESS OF THE FORM OF ACTION AND ON ANY THEORY OF LIABILITY, INCLUDING CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER TORT, SHALL BE LIMITED TO ACTUAL DAMAGES DIRECTLY CAUSED.

(2)   IN NO EVENT SHALL THE ENTIRE LIABILITY OF (a) ENKI AND ENKI REPRESENTATIVES COLLECTIVELY OR (b) CLIENT AND CLIENT REPRESENTATIVES COLLECTIVELY, IN EACH CASE UNDER ARISING FROM OR IN CONNECTION WITH THIS MASTER AGREEMENT, ALL OF THE STATEMENTS OF WORK, THE LICENSE OR USE OF THE ENKI SOFTWARE, CLIENT SOFTWARE, AND THE PROVISION OF SERVICES UNDER EACH STATEMENT OF WORK EXCEED THE GREATER OF: A) FIVE HUNDRED THOUSAND DOLLARS ($500,000); OR B) THE FEES PAID UNDER SUCH STATEMENT OF WORK DURING THE CURRENT TERM (PROVIDED THAT THE CURRENT TERM OF THE STATEMENT OF WORK SHALL BE NO LESS THAN THE FEES PAID DURING THE PRIOR 12 MONTH PERIOD.)

22

14.02 Consequential Damages. EXCEPT WITH RESPECT TO A BREACH OF CONFIDENTIALITY, DATA SECURITY OR EACH PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY, REGARDLESS OF THE FORM OF ACTION AND ON ANY THEORY OF LIABILITY, INCLUDING CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER TORT, FOR ANY LOSS OF INTEREST, PROFIT OR REVENUE BY THE OTHER PARTY OR FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES SUFFERED BY THE OTHER PARTY, ARISING FROM OR RELATED TO THIS MASTER AGREEMENT OR A STATEMENT OF WORK, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES.

14.03 Exclusions and Limitations.

(1) The limitations and exclusions of liability set forth in this Article are not applicable to direct damage to tangible property or injury to persons, including death, caused by and to the extent of the negligent acts or omissions of either Party.

(2) The limitations in this Article shall not apply to claims that concern or relate to (a) intentional infringement of either Party's intellectual property rights, (b) misappropriation or conversion of the other Party's intellectual property rights or (c) intentional, wrongful disclosure of the other Party's Confidential Information.

(3) In no event shall ENKI or its Representatives be liable to Client for any damages if, and to the extent, caused solely by Client's failure to perform its responsibilities, as set forth in this Master Agreement or the Statements of Work. In no event shall Client or its Representatives be liable to ENKI for any damages if, and to the extent, caused solely by ENKI's failure to perform its responsibilities, as set forth in this Master Agreement or the Statements of Work.

(4) ENKI shall have no liability for damages to Client to the extent solely and directly attributable to bugs in the Client Software ("Errors"), provided that such disclaimer of liability shall not apply to a) Errors attributable to ENKI; b) Errors which ENKI discovers but does not disclose to Client; c) Errors in materials provided by ENKI to Client where such materials are incorporated in the Client Software; and d) Errors where the correction of such Error is the responsibility of ENKI.

14.04 Mitigation. Each Party shall have a duty to mitigate damages for which the other Party is liable.

ARTICLE 15. MISCELLANEOUS PROVISIONS

15.01 Notices. Except as otherwise specified in this Master Agreement or a Statement of Work, all notices, requests, consents, approvals, agreements, authorizations, acknowledgements, waivers and other communications required or permitted under this Master Agreement and the Statements of Work shall be in writing and shall be deemed given when sent by facsimile to the

23

facsimile number specified below or delivered by hand to the address specified below. A copy of any such notice shall also be sent by express air mail on the date such notice is transmitted by facsimile to the address specified below:

In the case of Client, the information as listed above in the Preamble.

In the case of Enki:

Enki, LLC
Attn: Eric Novikoff
1049-C El Monte Avenue, Suite #32
Mountain View, CA 94040
Telephone: 650-964-9100, Ext. 301
Facsimile: 650-940-1700

Either Party may change its address or facsimile number for notification purposes by giving the other Party ten days' notice of the new address or facsimile number and the date upon which it shall become effective.

15.02 <u>Assignment and Third Party Beneficiaries</u>. Neither Party may, without the consent of the other Party, assign this Master Agreement or any Statement of Work or any of its rights under this Master Agreement or any Statement of Work, in whole or in part, and may not delegate its obligations under this Master Agreement or any Statement of Work (except for permitted subcontracts). Any such purported assignment or delegation in contravention of this Section shall be null and void. Each Party intends that this Master Agreement and the Statement of Work shall not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the Parties. Notwithstanding the above, either Party may assign this Agreement in the event of a change of control of such Party, provided that any such successor to Enki is not a provider of a SaaS based subscription billing services, at the time of the merger or sale of assets, in which case Zuora shall have the right to terminate this Agreement, upon providing written notice to Client.

15.03 <u>Relationship</u>. The Parties intend to create an independent contractor relationship and nothing contained in this Master Agreement or any Statement of Work shall be construed to make either Client or Enki partners, joint venturers, principals, Representatives or employees of the other. No officer, director, employee or Enki Representative retained by Enki to perform work on Client behalf under this Master Agreement or any Statement of Work shall be deemed to be an employee of Client or a Client Representative. Neither Party shall have any right, power or authority, express or implied, to bind the other. Enki shall have the sole right to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by Enki under this Master Agreement and the Statements of Work.

15.04 <u>Severability and Waivers</u>. If any provision of this Master Agreement or the Statements of Work is held by arbitrator(s) or a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Master Agreement or the Statements of Work, if capable of substantial performance, shall remain in full force and effect. No delay or omission by

24

either Party to exercise any right or power it has under this Master Agreement or the Statements of Work shall impair or be construed as a waiver of such right or power. A waiver by any Party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the Party waiving its rights.

15.05   Survival. The terms of Articles and Sections 7.01, 7.02, 7.03, 7.04, 7.05, 8, 9, 11, 13, 14 and 15 and all other provisions of this Master Agreement or any Statement of Work that contemplate observance or performance after expiration or termination shall survive the expiration or termination of this Master Agreement and the Statements of Work.

15.06   Governing Law. This Master Agreement and the Statements of Work and the rights and obligations of the Parties under this Master Agreement and the Statements of Work shall be governed by and construed in accordance with the Laws of California, without giving effect to the principles thereof relating to the conflicts of Laws.

15.07   Sole and Exclusive Venue. Subject to the provisions of Article 9, each Party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Master Agreement or the Statements of Work must be brought solely and exclusively in United States District Court for the District of California or in the state courts of the State of California and irrevocably accepts and submits to the sole and exclusive jurisdiction of each of the aforesaid courts in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other Party. Each Party hereto further irrevocably consents to the service of process from any of the aforesaid courts by mailing copies thereof by registered or certified mail, postage prepaid, to such Party at its address designated pursuant to this Master Agreement or the Statement of Work, with such service of process to become effective 30 days after such mailing.

15.08   Force Majeure. If and to the extent that a Party's performance of any of its obligations pursuant to this Master Agreement is prevented, hindered or delayed by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other similar cause beyond the reasonable control of such Party (each, a "Force Majeure Event"), and such non-performance, hindrance or delay could not have been prevented by reasonable precautions, then the non-performing, hindered or delayed Party shall be excused for such non-performance, hindrance or delay, as applicable, of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such Party continues to use its best efforts to recommence performance whenever and to whatever extent possible without delay, including through the use of alternate sources, workaround plans or other means. The Party whose performance is prevented, hindered or delayed by a Force Majeure Event shall immediately notify the other Party of the occurrence of the Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event.

15.09   Nonperformance. In the event that Enki's performance of the Services requires or is contingent upon Client performance of an obligation under this Master Agreement or a Statement of Work, and Client delays or withholds such performance beyond the agreed-upon time period (or beyond five days, if a time period is not specified), the time for the performance

25

of Enki's obligations shall be extended for the period of such delay in, or withholding of, performance.

15.10   <u>Right to Provide Services</u>. Each Party recognizes that Enki personnel providing services to Client under this Master Agreement and the Statements of Work may perform similar services for others that are not solely or primarily in the business of providing a SaaS based subscription billing services, and neither this Master Agreement nor the Statements of Work shall prevent Enki from using the personnel and equipment provided to Client under this Master Agreement or the Statements of Work for such purposes.

15.11   <u>Right to Manage Performance</u>. Enki has the sole right to supervise, manage, contract, direct, procure, perform or cause to be performed all work and services to be performed by Enki.

15.12   <u>Further Assurances</u>.   Each of the Parties acknowledges and agrees that, subsequent to the execution and delivery of this Master Agreement and the Statements of Work and without any additional consideration, each of the Parties shall execute and deliver any further legal instruments and perform any actions which are or may become necessary to effectuate the purposes of this Master Agreement or the Statements of Work.

15.13   <u>Solicitation</u>.  During the term of this Master Agreement, neither Party shall directly solicit any employees of the other Party without such Party's consent. The term "directly solicit" shall not include any employment of the other Party's personnel through the means of advertisements, job postings, job fairs and the like and any employment where the individual has made the initial approach to the hiring Party.

15.14   <u>Negotiated Terms</u>. The Parties agree that the terms and conditions of this Master Agreement and the Statements of Work are the result of negotiations between the Parties and that neither this Master Agreement nor the Statements of Work shall be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation of this Master Agreement or the Statements of Work.

15.15   <u>Consents, Approvals and Requests</u>. Except as specifically set forth in this Master Agreement or a Statement of Work, all consents, approvals, notices, requests and similar actions to be given by either Party under this Master Agreement or a Statement of Work shall not be unreasonably withheld or delayed and each Party shall make only reasonable requests under this Master Agreement and the Statements of Work.

26

15.16  Entire Agreement; Amendments; Counterparts.  This Master Agreement and the Statements of Work incorporated herein represent the entire agreement between the Parties with respect to their subject matter, and there are no other representations, understandings or agreements between the Parties relative to such subject matter. No amendment to, or change, waiver or discharge of, any provision of this Master Agreement or the Statements of Work shall be valid unless in writing and signed by an authorized representative of each of the Parties. This Master Agreement and the Statements of Work may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the Parties.

IN WITNESS WHEREOF, each of Client and Enki has caused this Master Agreement to be signed and delivered by its duly authorized representative.

Zuora, Inc.

By: _____
Name: _____JOSHUA WOODRUFF_____
Title: _____SR DIRECTOR, TECH OPS___

ENKI, LLC

By: _____
Name: _____D. JUBLEE_____
Title: _____CEO_____

27

# EXHIBIT B

# ENKI Datacenter Management Services Statement of Work
## Master Agreement Schedule A
### Version 2.7

## 1.  Introduction

This Statement of Work ("SOW") is issued pursuant and subject to the Master Services Agreement dated January 4, 2012 (the "MSA") between ENKI LLC (hereinafter "ENKI" ) and Zuora (hereinafter "Client", "Zuora" or "You"), and covers Managed Operations Services intended to operate Client's datacenters and virtual Infrastructure for the purposes of conducting Client's primary business.

## 2.  Contacts

Client (Primary) Contact: _Joshua Woodruff_
Phone: _(650) 554 581 or (925) 212-2067_
Email: _joshua.woodruff @ zuora.com_

Administrative Contact: _Same as Primary_
Phone: _____
Email: _____

Billing Contact: _Accounts Payable_
Phone: _(650) 641-3777_
Email: _ap @ zuora.com_

## 3.  Scope of Work

**Overview.**   ENKI shall provide the services set forth in this SOW to Zuora ("Operations Services").   To avoid itemizing the Operation Services in such a way that will require undue analysis, entitlement, and management effort for both parties, the scope of work shall be described as a general set of services constrained by limitations on the location, applicable domain, and applicable systems that the services will apply to, as well as constraints on the set of requestors.

| Overall Scope of Services | |
|---|---|
| Data Center Locations Under Management | 1)   Savvis SC5<br>2)   Coresite 2972 Stender Way<br>3)   SwitchNAP NAP7 Las Vegas (remote management only) |
| Server Count | 180 hosts total<br>180 virtual machines max |
| Points of Management | Hardware<br>Network<br>Virtualization System (Xenserver)<br>Virtualization Management (Abiquo)<br>Operating Systems (Windows, CentOS)<br>Database: MySQL |
| Service Types | System Administration<br>Network Administration<br>Hardware Administration<br>Database Administration<br>Business Process Execution |
| Requestors | Client-designated personnel |

| Monitoring (24x7x365) | |
|---|---|
| Covered Point | Limitations/Comments (fees if no fee specified than no additional fee required) |
| Network monitoring (Ping and SNMP monitoring) | Up to 40 network devices<br>Additional devices at $30/mo per monitored device |
| Host monitoring (core system metrics and Xenserver) | 180 physical hosts<br>Additional hosts at $30/mo per monitored server |
| Application VM monitoring (system metrics plus application-specific monitoring where available, including Tomcat, MySQL, etc.) | 100 application virtual machines<br>Additional VMs at $40 per monitored VM |
| Monitoring portal with performance history | One (1) dashboard included<br>Additional dashboards available on time and material basis |
| Outage communication | |
| Escalation/updates | Delivered to included SLA |
| Monitoring reports (on demand through portal.) | |
| 24x7 L1 & L2 incident response | Delivered to included SLA.  Incident response for application events limited to notification, restarts, or Client defined processes only. |

| Backup | |
|---|---|
| Covered Point | Limitations/Comments |
| Setup & Maintenance | Backup is provided by ENKI-maintained and licensed Backup Server installed in each data center designated by Client as a backup-hosting datacenter.  Pricing depends on number of covered virtual machines |
| Backup Operations | Client to specify covered data sets and retention policy. |
| Data Restoration | Determined by Client retention policy and backup hardware |
| Incident Response | |
| Restore Tests | Once per quarter |
| Reporting | As provided by tools |

| Maintenance & Administration | |
|---|---|
| Covered Point | Limitations/Comments (fees if no fee specified than no additional fee required) |
| Hardware diagnosis | |
| Patch management / 3rd Party Software updates | As requested and approved by Client, subject to conditions in Section 10 below.<br>Client must supply patch management process. |
| Network administration including managing firmware updates and patches | Edge and core network gear in covered datacenter locations only (Juniper and Mellanox gear only) and corporate edge and core devices. |
| Systems administration | Operating system, Xenserver (Free Edition), Abiquo |
| Database administration | No application data management.  MySQL only.  Operations limited to backup, restore, basic corruption repair, restarts, capacity planning, replication maintenance, basic troubleshooting limited to database server functionality excluding content-dependent failures,  and basic performance tuning.  ENKI shall not be responsible for designing replication architecture. |

| | |
|---|---|
| Log file management | ENKI shall implement Client policy for log file size, rotation, and retention. Scans of log files for monitored events implemented based on Client requests only. |
| File system management | ENKI shall manage file system free space and volume architecture according to client policies. |
| License & Service Contract Management | Client notification and vendor management where applicable. ENKI is not responsible for maintaining current licenses and service contracts for all covered hardware and software. |

| Service Management | |
|---|---|
| Covered Point | Limitations/Comments/fees (if no fee specified then no additional fee required) |
| Incident management | |
| Problem management | Infrastructure (hardware, OS, XenServer, database, Abiquo only) |
| Service level management | Notification and best-effort maintenance of customer-supplied target SLAs. Application dependent performance issues are not covered; ENKI will work with Client to determine root cause and solve issues as they arise. |
| Vendor management, including issue resolution, order management | Infrastructure (hardware, software, OS, XenServer, Abiquo) only |
| Security management (network/server) including exception notifications | Follow Client-supplied security plan. ENKI shall have no liability for security breaches (see terms.) |
| Weekly staff meeting participation | Scheduled for one hour per week of ENKI participation; no limit during limited-time crisis situations. Additional participation on an ENKI staff as-available basis, or at ENKI's discretion, under Change Order. |
| Relationship Management | Includes quarterly SOW/Relationship review meetings between ENKI management and Client administrative contacts |

| Request / Incident Management | |
|---|---|
| Covered Point | Limitations/Comments/Fees (if no fee specified then no additional fee required) |
| Email case response trail | |
| Client portal w/ case status and history | |
| Monthly support case review report | Sent to designated Client administrative contact. |
| Monthly case review meeting participation | |

| Security Management | |
|---|---|
| Covered Point | Limitations/Comments |
| Notification of Breach | Only for ad-hoc discovery and Client-supplied monitoring processes |
| Maintain firewall rules | As per Client requirements, according to Client change management procedures and processes. |

| Compliance / Administration | |
|---|---|
| Covered Point | Limitations/Comments |
| Business Processes | Software release/deployment only, on process acceptance by ENKI. |
| PCI Compliance | Follow Client processes; use client tools. See contract terms and notes section below. |

| SSAE 16 Compliance | Follow Client processes; use client tools.   See contract terms and notes section below. |
| Configuration & change management | Follow Client processes; use client tools |
| Other Compliance | None. |
| | |

| Physical Plant | |
| --- | --- |
| Covered Point | Limitations/Comments |
| Hardware diagnosis and replacement | Manage and/or directly attend to issues.  Onsite services at SwitchNAP not included.  It is expected that Client will retain remote hands services at SwitchNAP for routine maintenance. |
| Hardware add assistance, including installation of operating systems and third party software components, integration into the datacenter network, and registration of new hardware with directories. | Does not include "rack and stack" labor unless volunteered by ENKI staff as part of other covered in-scope responsibilities. |
| Capacity planning and architectural adjustments for increased capacity | Does not include new network, datacenter, or storage systems design. |
| | |

| OUT OF SCOPE | Exceptions/Comments |
|---|---|
| Internal IT Services (Design, maintenance, repair, administration, or problem resolution for software, networking, servers or desktop computers residing in or solely serving Client's offices or employees) | Servers residing in covered data center locations. Corporate edge and core networking devices. Hands-on services not available at SwitchNAP. |
| Automation Scripting, including creation of any programmatic implementation of Client administrative processes. | |
| Application Design & Implementation (Software design and coding) | |
| Client or end-customer data, including any maintenance, administration, or management processes that manipulate it and expose ENKI staff to its content. | |
| Hardware Provisioning.  ENKI shall not supply or install hardware of any type. | |
| Hardware Maintenance | ENKI will coordinate third parties to ensure hardware maintenance standards are met.  ENKI is not responsible for keeping maintenance contracts up-to-date for all hardware systems covered by this SOW. |
| Virtual Image and VPDC creation | Available as additional service |
| Virtual Image library creation | Available as additional service |
| Network or Datacenter design/build | Available as additional service |

Service Level Agreement (In-scope Services):

| Incident/Request Priority | Description | Response Time To Phone, Mail, Web or Monitoring Alert | Resolution Target (95% Confidence) |
|---|---|---|---|
| 1.  Critical Incident | Complete loss of cloud services (majority of Clients in one more clusters affected) | 15 minutes, 10 minutes typical | ASAP; 2 hours |
| 2.  High Priority Incident | Significant impact to cloud services with possible workaround (majority of Clients in one or more clusters affected) | 1 hour, 30 minutes typical | ASAP, 4 hours |
| 3.  Medium Priority Incident or Service Request | Failure with minimal impact to cloud functionality, time-sensitive work orders or service requests. | 8 business hours or to scheduled time if greater than 8 hours | 5 days or scheduled due date |
| 4.  Low Priority Service Request | Information or service requests. | 5 business days or scheduled time if greater than 1 day. | 5 days or scheduled due date |

5.   Client Responsibilities

   a.   Client shall maintain responsibility for all content-dependent management of end-user data within datacenters managed by ENKI.
   b.   With the exception of mutually agreed upon instances, ENKI shall retain sole root login capability to Client servers, including management and application infrastructure.  ENKI shall retain sole management login to client networking equipment.  Client's designated representatives shall have logged sudo access to non-shell root commands.
   c.   Provide access to a primary Client contact for administrative purposes, designated as the Administrative Contact.
   d.   Provide access to Client technical staff including a primary contact, designated as the Client Contact for project planning, SLA maintenance, service quality discussions, and managing and coordinating ENKI and Client obligations under this Statement of Work.
   e.   Provide published requirements for service level agreement (SLA) targets that ENKI shall be managing Client's services to achieve.
   f.   Apply appropriate labor and management attention to items on any project plan for which Client and ENKI are jointly responsible to ensure overall schedule stays on track.
   g.   Provide ENKI with IPSec VPN access to all internal secured networks necessary for access to ENKI-supported physical and virtual infrastructure, applications, and other software.
   h.   Provide current support contracts for all ENKI-supported network hardware, servers, storage systems, and software including but not limited to operating systems, hypervisors, private cloud software, and databases.
   i.   Purchase and installation of server hardware, unless this service is provided under contract by ENKI.
   j.   Notify ENKI prior to placing any new servers into revenue service, with at least 5 business day's advance notice to allow ENKI to complete all required integration and testing.
   k.   Provide approved, written documentation for security plan.
   l.   Provide approved, written documentation for any business or administrative processes that ENKI is expected to execute.  Accept ENKI input to modify processes for cost effectiveness and manageability.
   m.   Provide ENKI advance notice of at least one week for scheduled/project activities required of ENKI.
   n.   Maintain current compliance documentation for advertised certifications such as PCI, SOX, SSAE16, etc.; ENKI shall assist in maintaining the currency of such documentation.
   o.   Resolve open issues that ENKI has with Client processes, data center design and configuration, work product requirements, and unmet expectations of ENKI or Client. Such issues will be available to Client designated staff as assigned issues in the ENKI support ticketing system with email notification on status change.  Client agrees to resolve such issues with ENKI representatives according to the SOW SLA terms for priority 4 incidents, in order to take advantage of automatic tracking offered by ENKI's support ticketing system.
   p.   Attendance of Client Administrative Contact and appropriate management at quarterly SOW/Relationship review meetings.
   q.   Maintain an ENKI-accessible document repository for shared documents including but not limited to requirements, process specifications, schedules, plans and the like. Repository shall support subscriptions for change notifications.  Client shall maintain document versions numbers.

6.   ENKI Responsibilities:

   a.   Provide Services as per the scope documented by ENKI in this SOW.

b. Conduct regular staff meetings and project/service reviews with Client as necessary but not less often than every week, as well as quarterly review meetings.
c. Escalate unresolved issues to the appropriate Client contacts.
d. Proactive notification of performance, security, or uptime-related issues as ENKI becomes aware of them.
e. Provide feedback and recommendations for improving Client's business, administrative, and management processes for covered Datacenter operations.
f. Support and execution of up to one disaster recovery tests or Datacenter "Flip" (Primary/secondary role exchange) per month according to Client DR plans. Client DR plans and Datacenter "Flip" process subject to ENKI approval.
g. Background checks for all ENKI staff responsible for providing operations services to Client.
h. Support for all ongoing business processes required to achieve or maintain PCI compliance, including one (1) PCI audit and one (1) SSAE16 audit per year which may involve requests for documented and released processes, procedures, configurations, and Q&A from the PCI auditor.
i. ENKI shall use sudo logged access to non-shell root commands only.
j. Provide a Primary Contact for management of services, coordination with Client, and approvals.
k. Resolve open issues that Client has with ENKI processes, work product, and unmet expectations of ENKI or Client. Such issues will be viewable and updatable by Client designated staff in the ENKI support ticketing system with email notification on status change. ENKI agrees to resolve such issues with Client representatives according to the SOW SLA terms for priority 4 incidents.
l. Provide support for open-source software components of Client infrastructure on a best-effort basis. Client is advised to contract with third parties for support of open source components as required to ensure adequate support levels. ENKI will meet SOW SLA terms for management of third party open source support providers.
m. ENKI to complete all required integration and testing of any new servers, in accordance with mutually agreeable processes jointly developed with ENKI staff.
n. ENKI shall contribute to the generation of any business processes, administration processes, service level agreements, or security plans that ENKI is expected to execute or implement. Such contribution shall include assisting in the development, documentation, maintenance of currency, and verification of Client's operating procedures.

7. **Ramp-Up Considerations**
a. ENKI shall not be responsible for providing services to Client that must be delivered in compliance with standards, processes, or SLAs (other than those provided herein) until such mutually acceptable documents or training have been provided by Client.
b. ENKI shall initiate implementation of Client-provided processes and standards as required for implementing in-scope deliverables within 30 days of completion of training or transfer documentation, subject to approval of such training and documentation by ENKI.
c. ENKI shall provide up to two employees as students (including the Primary Contact) for training during the Ramp-Up phase. These designated employees shall train remaining ENKI staff designated to provide services under this SOW.
d. ENKI and Client shall have shared responsibility for covered services during ramp-up period. Transfer of responsibility to ENKI shall require explicit handoff approved by representatives of both parties, subject to requirements of 7(b).

8.    Pricing, Duration and Location

The duration of this contracted Statement of Work shall be 18 Months.

| Service | Setup Fee | Monthly Charge (Rate) | Start Date | Duration | Primary Work Location |
|---|---|---|---|---|---|
| Operations Services | $15,000 | $53,000* | 1-Mar-2012 | 18 months | ENKI Offices |
| Network Monitoring | $0 | $30/device | | | |
| Host Monitoring | $0 | $30/host | | | |
| Application/VM Monitoring | $0 | $40/VM | | | |
| Backup (host or VM) | $0 | $5/device | | | |

*: see credits under Section 10, "Payment" below.

Hourly Rates for Out-of-Scope Billable Services  (Billed in Arrears)

| Item | Conditions | Rate | Minimum Charge |
|---|---|---|---|
| Data Center Consulting | Hourly | $250 | $250 |
| Onsite Support | Hourly | $225 | $225 per incident |
| Remote Support | Hourly | $200 | $200 per incident |

All Out-of-Scope billable services must be authorized by Client.

9.    Change Orders

All changes to provided services as documented in this Statement of Work shall be accompanied by an appropriately authorized Change Order, which shall be included in this Statement of Work by reference once executed.   Change orders may incur extra charges.

10.    Contract Terms and Notes

   a.   See the ENKI Master Services Agreement (MSA) dated January 4, 2012 for Terms and Conditions governing this Statement of Work.  In the event that these terms conflict with the MSA, these terms shall take precedence.
   b.   Client is limited to 1 (one) disaster recovery test projects co-managed by ENKI per month. Additional tests may be requested as a Change Order on a time and materials basis.
   c.   Client is limited to 1 (one) PCI compliance audit per year supported by ENKI staff.
   d.   Client is limited to 1 (one) SSAE16 compliance audit per year supported by ENKI staff.
   e.   Client shall permit redundant VPN network access to all facilities to ENKI staff.
   f.   Client shall be responsible for all licensing and support contracts for third-party software products hosted within Client's datacenters.
   g.   ENKI shall support new technologies or hardware introduced into the covered datacenters.  If ENKI's staff does not have the required skills, Client shall be responsible for providing appropriate training and certification if requested by ENKI or required by Client.  ENKI shall not be responsible for supporting new technologies until such training is complete or a commercially reasonable period of time has elapsed to permit ENKI staff to become familiar with the new technology.
   h.   ENKI is not responsible for schedule slips not attributable to ENKI and due to Client deliverables or third-party deliverables such as training or requirements documents, third-party support, Client training of ENKI personnel, required equipment, or software licenses and upgrades; however ENKI shall make all reasonable effort to manage timely execution of Client and third-party responsibilities.
   i.   Client recognizes that no specific guarantee is being offered by ENKI about the completeness or accuracy of the compliance measures required under Section 404 of the Sarbanes-Oxley Act, as amended ("SOX") or the Payment Card Industry Data Security Standards, as amended ("PCI DSS")  The technical staff of ENKI will make every commercially reasonable effort, within the scope of this Statement of Work, to comply with the internal controls required to meet or exceed any applicable industry standards, including but not limited to: (i) maintaining a secure network, systems, and applications, and (ii) tracking access of ENKI and client staff where applicable and in support of Client's documented processes.
   j.   ENKI shall have no liability for security breaches not caused by ENKI or resulting from feedback provided by ENKI or failure to provide feedback, occurring in Client environment that has been deployed and managed according to Client-supplied security plan and Client-supplied processes and systems architecture documentation.  ENKI's responsibility in this case shall be limited to remediation and providing timely notification of breaches.
   k.   ENKI shall not be responsible for executing any processes, plans, or SLA requirements that have not been approved by ENKI and Client.  Approval shall not be unreasonably withheld by either party, and may be authorized by ENKI Operations Director or executive staff.  Such approval may result in additional charges to be documented and approved with a Change Order.
   l.   ENKI shall not be responsible for managing any hardware systems, hardware systems architecture, or third-party software systems not described in this SOW or approved by the parties.  Any such changes must be approved by ENKI to ensure adequate service levels.  Approval shall not be unreasonably withheld, and may be authorized by ENKI

Operations Director or executive staff.  Such approval may result in additional charges to be documented and approved with a Change Order.

m.  Any non-Zuora software, equipment, documents or tools owned and utilized by ENKI for delivering the Services at Client sites, shall remain the property of ENKI and be returned to ENKI upon completion of the assignment or on written request by ENKI.

n.  Email sent to authorized primary contact for each party shall be sufficient to provide authorizations or approvals as required by this Agreement, provided that authorized persons provide such approvals.

o.  Acceptance of this SOW shall terminate the contract Zuora 020511 (PrimaView Monitoring) provided that all undisputed charges billed under that contract have been paid.  Such termination will not incur any cancellation fees or other penalties.

11.  Payment

a.  General.  Client agrees to pay ENKI for the Services described herein at the Rates specified above, including any one-time charges, under the terms of the Master Services Agreement.  Payments are billed monthly, in advance of service provided

b.  Termination Fee.  In the event of a Termination by Client (unless such termination is pursuant to Section 12.02 (1) in the MSA, Client shall pay ENKI a termination fee equal to the charges paid during the month prior to the date of the termination notice, in addition to balances incurred during any waiting period.

c.  Credit for Duplicated Charges.  Quoted charges include a credit of $5000 per month for the Term of the SOW, "Zuora Service Continuity / DR Environment" dated January 4, 2012, which duplicates some of the services in this Agreement.

d.  Ramp-up Credits.   ENKI shall provide a credit of $30,000 during the first calendar month of this Agreement, $20,000 during the second calendar month, and $10,000 during the third calendar month in consideration of reduced service delivery due to ramp-up requirements.  The timing of these credits shall not be considered as a guarantee of the schedule for service availability.  Any requests by Client for additional project work during this period may, upon the parties mutual agreement, reduce Ramp-up Credits according to the terms of the associated Change Order.

e.  Setup Fees.  Setup fees shall be due and payable immediately upon approval of this SOW.

f.  Month-to-month premium charges.  In the event that this SOW is extended under month-to-month terms under the MSA, Client shall pay ENKI a convenience charge of $10,000 in addition to monthly charges specified herein.

12.  Expenses

ENKI shall provide services under this Statement of Work remotely and where appropriate or necessary at Client's business offices or Data Center locations.  Client shall be responsible for all travel expenses incurred by ENKI staff engaged in performing services under this SOW, in the cases where ENKI staff are required to travel to sites other than the primary work location listed in this Statement of Work, with the exception of any local travel of 50 miles or less.   From time to time and with Client's approval, ENKI may purchase tools, equipment, or material on behalf of Client, which will be included in Client's monthly bill.

13.  Indemnification

ENKI shall not provide any indemnification beyond that detailed in the Master Agreement without prior written approval by authorized ENKI representatives

**Accepted by the authorized representatives of:**

Accepted:
CLIENT

_____
(Authorized Signature)
Name: TYLER SLOK

Title: CFO

Date: 2/22/2012

Accepted:
ENKI LLC

_____
(Authorized Signature)
Name: ERIC NOVIKOFF

Title: COO

Date: 23-FEB-12